UNITED STATES, Appellant,

v.

Shao T. HSU, Appellee.

No. 80–13.

District of Columbia Court of Appeals.

Argued Jan. 28, 1981.*

Decided Nov. 12, 1981.

\* This case was argued on January 28, 1981, and subsequently the record was remanded to the trial court for further consideration. The trial court filed supplemental findings and conclusions on May 28, 1981, whereupon this court, on June 24, 1981, directed the parties to file supplemental memoranda.

**470**

Michael W. Farrell, Asst. U.S. Atty., with whom Charles F. C. Ruff, U.S. Atty. John A. Terry and Davis S. Krakoff, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Jeffrey Lee Greenspan, Washington, D.C., for appellee.

Before KERN and NEBEKER, Associate Judges, and GALLAGHER,** Associate Judge, Retired.

KERN, Associate Judge:

A jury found appellee guilty of perjury, D.C. Code 1973, § 22–2501, but this court, with one judge in dissent, reversed the conviction on the ground that the record was insufficient to demonstrate a voluntary and intelligent waiver of counsel on the part of appellee who had proceeded to try his own case. *Hsu v. United States*, D.C.App., 392 A.2d 972 (1978).

Prior to the retrial the government was faced with the claim by one of its witnesses from the original trial that he had no present memory of the events on the date of the alleged perjury about which he had testified at the first trial. Therefore, it sought a ruling by the trial court to admit into evidence the transcript of his testimony at the first trial under either of two exceptions to the hearsay evidence rule: past recollection recorded or prior cross-examined testimony.

The trial court heard testimony from the witness and argument from counsel and the court disbelieved the witness' assertion that he could not remember the crucial events to which he had testified in the first trial. Accordingly, the court ruled that the hearsay exceptions asserted were not available because the witness' recollection was *not* exhausted and the witness was *not* unavailable for the retrial.

In addition, the court ruled that since the waiver of counsel at the first trial had been invalid it would violate appellee's Sixth Amendment Right to Confrontation to allow the witness' prior testimony to come into evidence at the retrial. The court excluded the prior testimony of the witness from use at the retrial. The government now appeals that ruling.

The government contends on appeal that the prior testimony of this witness meets all the criteria of the prior cross-examined testimony exception to the hearsay rule: [1] the declarant's testimony is in fact unavailable because he claims he has no memory of the events surrounding the alleged perjury; the declarant's testimony at the first trial was under oath; the issue in the first trial and at the retrial is substantially the same; and, appellee had the opportunity to cross-

---

** Judge Gallagher was an Associate Judge of the court at the time of argument. *His status changed to Associate Judge, Retired, on February 27, 1981.*

1. The government concedes the correctness of the court's ruling that the hearsay exception for past recollection recorded is not available to this witness since the court found incredible the witness' assertion that his present recollection is exhausted.

examine the declarant in the former proceedings and did so with skill and vigor.

As to the unavailability of the witness, "[w]hether or not Johnson's claim of loss of memory is genuine, he is unavailable as a witness despite the Government's strongest efforts to produce him, and his failure to remember, even if feigned, should not deprive the trier of fact of reliable and probative testimony he has previously given." (Brief at p. 4.)

Several federal courts of appeals have confronted the issue we have in the instant case: a prosecution witness at the first trial who upon retrial feigns lack of memory of events to which he had testified at the prior trial. In dealing with this problem, the Fifth Circuit has affirmed the view:

> It is the belief of this Court that the statements made in prior sworn testimony are admissible not only to impeach his claim of lack of memory, but also as an implied affirmation of the truth. The trial court's hands should not be tied where a witness does not deny making the statements nor the truth thereof, but merely falsifies a lack of memory. [*United States v. Collins*, 478 F.2d 837, 839 (5th Cir. 1973).]

The Second Circuit has in such a unique situation recognized the "discretionary latitude in the search for truth" vested in the trial court and allowed prior testimony of the witness feigning forgetfulness to come in as substantive evidence under the hearsay exception for prior cross-examined testimony. *United States v. Insana*, 423 F.2d 1165, 1170 (2d Cir. 1970).

The Federal Rules of Evidence recognize that a witness may be classified as "unavailable" for the purpose of the hearsay exception if he "testifies to a lack of memory" and his "claim of lack of memory" is not the result of any wrong-doing by the moving party. Fed.R.Evid. 804(a). *See also* J. Weinstein and M. Berger, *Weinstein's Evidence*, § 801(d)(1)(A)[04], at 100 n.13 (1980); Saltzburg and Redden, *Federal Rules of Evidence Manual* at 600, 613 (2d Ed. 1977).

Judge Friendly, in *United States v. DeSisto*, 329 F.2d 929 (2d Cir. 1964), has trenchantly explained why a witness' prior trial testimony which is at odds with his assertions at a subsequent proceeding may be received as substantive evidence and not be limited to only the credibility of the witness.

> The rule limiting the use of prior statements by the witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as "pious fraud," "artificial," "basically misguided," "mere verbal ritual," and an anachronism "that still impede(s) our pursuit of truth." ... [T]o tell a jury it may consider the prior testimony as reflecting on the veracity of the later denial of relevant knowledge but not as the substantive evidence that alone would be pertinent is a demand for mental gymnastics of which jurors are happily incapable.

> \* \* \* \* \* \*

> Testimony at a former trial has already been once subjected "to the test of Cross-Examination" on which our law places primary reliance for the ascertainment of truth. [*Id.* at 933, 934.]

We are persuaded under the circumstances here and upon consideration of the precedent above that Mr. Johnson was unavailable within the meaning of the hearsay exception for prior cross-examined testimony. Accordingly, we reject the evidentiary basis for the trial court's exclusion of Mr. Johnson's prior testimony from the retrial.

We examine now the constitutional basis of the trial court's ruling that excluded from evidence at the retrial the prior cross-examined testimony of Mr. Johnson.

The Supreme Court has stated in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980):

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In

the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. *See Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page,* 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968). See also *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900); *California v. Green,* 399 U.S. [149], at 161–62, 165, 167, n. 16 [90 S.Ct. 1930, 1936–37, 1938, 1939, n. 16, 24 L.Ed.2d 492].

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts,* 291 U.S. 97, 107 [54 S.Ct. 330, 333, 78 L.Ed. 674] (1934). [*Id.* at 65, 100 S.Ct. at 2538.]

The Court concluded in *Ohio v. Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at 2539 that "certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.'" *Id.* at 66, 100 S.Ct. at 2539, *quoting Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). The Court expressly recognized prior cross-examined testimony as a hearsay exception with "solid foundations."

The trial court concluded in its exclusionary ruling that the prior cross-examined testimony exception to the hearsay rule recognized by the Court in *Ohio v. Roberts* was lacking trustworthiness in the instant case because appellee acted as his own lawyer at the original trial. The trial court opined: "[c]ross-examination through counsel seems clearly to be required as a necessary precondition to admissibility under the Constitution."

We note that in *Ohio v. Roberts, supra* at 73 n.12, 100 S.Ct. at 2543, the Court recognized the "unusual circumstances" present in *Mancusi v. Stubbs, supra.* There, the Court pointed out that in *Mancusi*: "the defendant's representation at the earlier proceeding, provided by counsel who had been appointed only four days prior thereto, ... had been held to be ineffective." The Court further recognized that these unusual circumstances required inquiry into the adequacy of the cross-examination of the witness whose testimony was being proffered subsequently under the hearsay exception for prior cross-examined testimony; however, it is important to note that the Court did *not* exclude out of hand such testimony solely because counsel at the prior trial had been deemed ineffective.

The teaching of the Court in our view is that when unusual circumstances exist at the time the prior testimony was elicited, such as the defendant proceeding pro se at the prior trial, the "character" of the cross-examination of the declarant at the trial must be closely examined "to ensure that an adequate opportunity for full cross-examination had been afforded," and thus the trustworthiness of such prior testimony assured. *Ohio v. Roberts, supra* at 73 n.12, 100 S.Ct. at 2543. Accordingly, we must explore the "effectiveness" of the cross-examination of Mr. Johnson by appellee who acted as his own counsel at the first trial.

In *Ohio v. Roberts,* the Court itself undertook such an inquiry and the focus of the Court's inquiry is instructive for us:

Counsel's questioning clearly partook of cross-examination as a matter of *form.* His presentation was replete with leading questions, the principal tool and hallmark of cross-examination. In addition, counsel's questioning comported with the principal *purpose* of cross-examination: to challenge "whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed

by the language he employed." [*Id.* at 70–71, 100 S.Ct. at 2541–2542; footnote omitted.]

We note in the instant case that appellee's "presentation" was replete with leading questions which the Supreme Court recognized is the principal tool and hallmark of cross-examination.[2] Appellee also explored in depth the bias of Mr. Johnson against him, and developed the incongruity of the witness' explanation as to why he had spent so much time visiting appellee's properties as compared to the rental properties of other landlords. Finally, appellee sharply probed into the accuracy of Mr. Johnson's testimony on direct examination as to what he had seen on the day in question. Indeed, the dissenting judge of the panel of this court which reversed appellee's conviction for absence from the record of clear waiver of counsel commented that appellee had "exhibited considerable skill in his . . . cross-examination of witnesses." *Hsu v. United States, supra* at 989.

■ We, too, are impressed with the cross-examination conducted by appellee and deem it effective enough to assure that full opportunity for cross-examination was afforded appellee, as required by *Ohio v. Roberts*, and thus the trustworthiness of the prior cross-examined testimony is also assured.

In sum, we are unwilling under the particular circumstances in this case to preclude the use at retrial of the prior testimony of Mr. Johnson upon either evidentiary or constitutional grounds. As to the evidentiary aspect of the conscientious trial judge's ruling, we must conclude that when the witness *asserted* lack of memory of the events to which he had previously testified he was "unavailable" for the purpose of the hearsay exception despite the fact that the court believed he was feigning lack of memory.

As to the Court's view of the requirement of the Confrontation Clause, we are unwilling to adopt a rule that in any case in which

a defendant chooses, however imperfectly he may make and record that choice, to proceed to trial without counsel, his cross-examination of a witness during that trial is *per se* ineffective. Rather, the Supreme Court's teaching in *Mancusi v. Stubbs*, as subsequently refined in *Ohio v. Roberts*, is that in such an unusual case the reviewing court is obliged to scrutinize the record. Here, the cross-examination conducted by appellee met its principal purpose: to probe whether the declarant was telling the truth and accurately perceived and remembered the events he had related upon direct examination; and, whether his intended meaning upon direct examination was adequately conveyed to the jury.

We conclude that under the recent pronouncement by the Supreme Court in *Ohio v. Roberts*, the invocation of the hearsay exception for prior cross-examined testimony in the instant case does not offend the Sixth Amendment.

*Remanded for further proceedings consistent with this opinion.*

## APPENDIX

### PROCEEDINGS

Thereupon,

### JAMES JOHNSON,

having been called as a witness on behalf of the Government and having been first duly sworn, was examined and testified, as follows:

### CROSS–EXAMINATION

BY DR. HSU:

Q. Mr. Johnson, have you worked for me before?

A. No, sir.

Q. The first time I met you was where?

A. I don't recall.

Q. Were you assigned to the southeast area to do your inspection work in 1975?

---

2. We append the complete cross and re-cross examination conducted by appellee of the witness.

A. That's correct.

Q. Did you go to my building in Northwest, the address is 1621 T Street?

A. Yes, I did.

Q. Did you go to my building in Northwest on 2000—16th Street?

A. Yes.

Q. But your duty was assigned to Southeast?

A. That's correct.

Q. Why did you go to my building?

A. The reason I went to your building, sir, was because you called me at home in reference to apartments I was assigned to in my area, and you asked me if I would go to your buildings to check them out because you had a long deficiency list of violations and needed some help in terms of seeing about getting them corrected.

Q. How many times did you go there?

A. I would say about eight or ten times.

Q. Do you know I have your testimony record of the last two cases about this? Do you know that?

A. No, I didn't know it.

Q. Are you familiar with these two cases where you gave testimony before?

A. Yes. Right.

Q. So, you did say something under oath before?

A. Yes, you brought them up several times.

Q. Now you say you went to my building eight or nine times; is that what you say?

A. I would say over the course of a couple of weeks, yes.

Q. You go there every day?

A. No, I didn't go there every day.

Q. How many days in a couple of weeks?

A. I would say eight or ten days. I'm not sure. It has been some time.

Q. You were there eight or nine times, so you were there most every day; is that correct?

A. Out of a course of two weeks, yes.

Q. How long did you stay there each time you go there?

A. I'd say about an hour.

Q. And the reason you went there was because what?

A. The reason I went there to the buildings is simply because you said that if I went to the building you would see that all the violations in my area that I was assigned to would be corrected.

Q. You consider this as a favor to a landlord? Is that a favor? You work for me there, and you consider this a favor to a landlord?

A. Not as much a favor but as trying to see that the violations in my area were corrected.

Q. But that's not your jurisdiction; is that correct?

A. But I'm a Housing Inspector all over the D.C. area.

Q. But at that time you were assigned to which area?

A. I was assigned to the Southeast area.

Q. But the building you went to, my building, was in—

A. Northwest.

Q. Not Southeast; is that correct?

A. That's correct.

Q. But you did go there?

A. Yes, I did.

Q. And you spent some time there.

A. That's correct.

Q. Have you done such a favor to any other landlord?

A. I've done favors for landlords and tenants, likewise.

Q. And worked every day for two weeks?

A. I've never done that. That's correct.

Q. You've never done that before.

A. No, because I never had as many violations in so many buildings.

Q. The twenty dollar cash bills I give to you you put in your pocket; do you remember that?

A. That's not true, Dr. Hsu.

Q. Then why you didn't go there anymore?

A. Because it became quite evident, sir, that you weren't planning on doing any work in the first place.

Q. Did you ever tell me, you say, "Dr. Hsu, I get sick of this inspector job." Did you ever tell me that?

A. I don't recall ever saying that; no sir.

Q. Do you want a manager's job from me to manage the property?

A. No, sir.

Q. Do you know who is Mr. Ewing? Have you met Mr. Ewing?

A. The name sounds familiar.

Q. Sounds familiar?

A. Right.

Q. Is he a tall man or a short man?

A. I don't recall.

Q. Did you go to my building in Southeast, 1400 Congress Place?

A. I been to all your buildings.

Q. Did you see the manager in the basement?

A. Oh, Mr. Ewing, right.

Q. You know him?

A. Right.

Q. Did you ask me, "Dr. Hsu, what I cannot do, then Mr. Ewing can do"? Did you ask me that?

A. No, I don't remember ever saying anything like that to you, sir.

Q. And when you went to my buildings in Northwest, two buildings, what did you do there?

A. I went to the tenants' apartments, identified myself as being a Housing Inspector, and told them that I would like to look at the paint, violations in their apartment, because you had painters on the premises that were going to correct the items.

Q. Did they have inspectors in that area at that time you were working for me?

A. That's correct.

Q. What was his name?

A. I think his name was Straley.

Q. When you went there, you did not think you were going over his head?

A. Not really, because you had asked me to go there because of my expertise as a Housing Inspector I would know what was necessary to correct the items.

Q. Did you work with my painters?

A. If you mean did I tell them what apartments were ready to be painted, what needed to be done, yes.

Q. Did you give orders or tell my men what to do?

A. I was not in charge of them. I only merely referred them to an apartment that was ready to be painted or what have you. But the ultimate decision, whether they went there or not was theirs to make, not mine.

Q. And after inspecting the apartment, what did you do? You stayed there an hour, two hours. What did you do?

A. What did I do?

Q. Yes.

A. I would leave.

Q. Do you mean that you went there, looked at the apartment, and then left?

A. No. I'm saying after I looked at the apartment.

Q. Then what did you do?

A. When I got through, I told the Reverend which apartments they could go into, then I would leave.

Q. So, you did tell the Reverend Dennis, or other people, what to do?

A. I would say yes to that extent, yes.

Q. Now, I want to show you testimony. You read it, then you tell me what it say.

THE COURT: What document and what page?

DR. HSU: Your Honor, it is the same transcript.

THE COURT: What page?

DR. HSU: The page number is No. 95.

THE COURT: What transcript?

DR. HSU: This one is before Judge Beard, Your Honor, I have to submit this.

THE DEPUTY CLERK: No. 3.

THE COURT: Why don't you just go over and show Mr. Weinberg what you are talking about.

DR. HSU: This is July 21st.

BY DR. HSU:

Q. Read this line here, No. 5.

[Pause.]

A. "I was telling Dr. Hsu what to do."

Q. Then you read again Page 99.

THE COURT: In relation to all of this, the same instruction I gave Mr. Marshall—at the time of Mr. Marshall's testimony—about prior inconsistent statements applies to any that may or may not be demonstrated, applies to this witness.

BY DR. HSU:

Q. From Line 15 to 21.

A. "I would go over to the place, and I would knock on the tenant's door that were on the deficiency list that the inspector had brought up to see how much (indiscernible) paint they had throughout the apartment, and then I would in turn tell the workmen that Dr. Hsu had work for him at that apartment, what apartments to get in, and if he should paint the whole wall or just part of the wall."

Q. So, in one place you say you work with my men; another place you say you only tell me what to do; is that correct?

A. I—

Q. That's your testimony.

THE COURT: Let him answer the question.

THE WITNESS: I didn't understand the question.

BY DR. HSU:

Q. When you a witness in a case tried on July 19th by Judge Beard, were you the one charging me with 100 violations?

A. That's correct.

Q. Did Judge Beard ask you how many you can remember yourself?

A. That's true.

Q. And what was your answer?

A. My answer was that I could only remember five or so.

Q. So you mean you are charging me with 120 violations and you can only remember five of them yourself?

A. The judge did not allow me to read from my deficiency list.

Q. He did not allow you to read. You mean you forgot completely what you have seen in apartment you put down on violation list?

A. As a matter of fact I went to a lot of your buildings, and I couldn't remember all of them, no. We always had deficiency lists to read in court cases, which he did not allow me to read from.

Q. So, therefore, did you tell Judge Beard you can only remember five out of the 120—

A. I can only remember, that's correct, without the deficiency list.

Q. Did the judge find me guilty?

A. I think he found you not guilty.

Q. Not guilty.

A. I think so.

Q. Why you try to harass me like that, Mr. Johnson?

A. As a matter of fact, I've never tried to harass you. I've always tried to do my job.

Q. Is that because I fire you over there?

A. You have never fired me, and any violation I wrote up was because it was there.

Q. Is that because I did not give you a job and give to Mr. Ewing?

A. That's not true.

Q. Then that morning you stated, you saw Mr. Marshall deliver paper to me.

A. That's correct.

Q. You knew exactly what paper it is, a size like this?

A. Yes, it was a size like that.

Q. A size like that?

A. Yes.

Q. And all legal papers size like this.

A. I don't know.

Q. Are you sure the paper he delivered to me, the contents of paper, are you sure you know?

A. No, because I didn't read it.

Q. So you are not sure the paper he deliver to me was some pleadings, petitions, or amendments, or you are not sure, are you?

A. I'm sure it said "order", and I'm sure that it said "Patsy Thomas v. Dr. Hsu."

Q. How did you know whether it was order if you didn't see that?

A. I beg your pardon?

Q. You said, in your testimony in previous case—

A. Right.

Q. You said you see some kind of paper similar to an order.

A. I was showed an order, and I was asked if this was similar, and I said "Yes, this is similar to the one I saw."

Q. But you said you didn't read it.

A. I did not read it all verbatim, no.

Q. You didn't see the letter "order," did you? You didn't see the "order"?

A. If I am not mistaken, I did see the letter order up at the top.

Q. What did the order say?

A. All the other things I saw was "Dr. Hsu v. Patsy Thomas."

Q. So, it could have been other pleadings, or other paper too?

A. I didn't think the lawyer had any reason to tell me otherwise.

Q. And when you saw me over there that morning, when he serve paper to me, did he serve to me paper like this or

A. He handed it to you like this.

Q. Open or closed?

A. Open.

Q. And you say I put in pocket?

A. I did not say it.

Q. Did you know what I did with the paper?

A. I saw you take off your glasses and read the order, and I saw you, if I'm not mistaken, put it on a stack of papers that you had before you.

Q. Tell me, you spend so much time at my building at Northwest, 2000—16th Street, 1621 T Street, you just did a favor without a reward?

A. I thought at the time you were going to correct the violations, because we have a lot of them in my area.

Q. But you said you have never done such a favor to anyone else.

A. I've done favors before, but not on that scale, that's true.

Q. That's a big scale.

A. Well, it was out of the ordinary, because I never had that many violations before.

DR. HSU: That's all, Your Honor.

### RECROSS EXAMINATION
### BY DR. HSU:

Q. Mr. Johnson, did you say you went there, went to the different apartments, and find out what the repair work, so forth, and you talk to my workmen?

A. That's correct.

Q. In that area where you are not assigned to; correct?

A. That's correct.

Q. Why didn't you do the same thing to my workmen in the area that you were assigned to? You were assigned to Southeast, weren't you?

A. Yes.

\* \* \*

Q. Then why didn't you do the same thing to the buildings and all my workmen, and everything, in the area ... where you are assigned to you are obligated to do something for the D.C. Government? Why didn't you do that?

A. Because you never, you know, you never said anything about the fact that you

wanted me to do it. At the time had you said you needed someone to assist you over there to abate the violations, I would have been glad to help you.

Q. So, you listen to me then?

A. I listened to you?

Q. Right. Because I did not tell you that, you did what I told you, and you did not do it if I did not tell you; is that correct?

A. That's not true. There was a difference. There is a difference.

First off the difference is that you asked me to go to the Northwest place.

Q. You went.

A. Because you wanted to correct the violations.

Q. You went.

A. And I went.

Q. But the Government asked you to do something at Southeast, wasn't it?

A. That was my primary responsibility, yes.

Q. Then why didn't you do the same thing the way you did in Northwest, do the same thing in Southeast?

A. You weren't doing anything in Southeast. I could not do what you would not do.

Q. Let me ask you another location. One evening about six o'clock when you were at 1621 T Street, and I was at 2000—16th Street, and you drove your car, you came 2000—16th Street to see me, do you know why you were working 1621 T Street, and then you come over to 2000—16th Street to see me?

A. I don't ever remember seeing you at the buildings at all.

Q. But you say you have never seen me in my own property, 1621 T Street and 2000—16th Street?

A. No, I don't believe I ever have.

Q. Within the two weeks period.

A. That's correct.

Q. But you saw my manager, Reverend Dennis, painter every day.

A. When I was there, yes.

Q. And if I can make your memory refresh you, you went there that evening, you said, "Dr. Hsu, I'm short on money today. Will you give me something for this?" Did I give you three twenty dollar bills, sixty dollars that day?

A. Dr. Hsu, I don't ever recall you ever being in that building while I was there, and certainly that didn't occur.

Q. 2000—16th Street. You went there from 1621 T Street to 200—16th Street. You knew you found out from my manager, and you come to see me, and then I ask you—

A. Dr. Hsu, that's not true.

DR. HSU: That's all, Your Honor.