James JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 82–1051.

District of Columbia Court of Appeals.

Argued Oct. 12, 1983.

Decided May 31, 1984.

Scott Howe, Public Defender Service, Washington D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington D.C., at the time the brief was filed, was on the brief for appellant.

G. William Currier, Asst. U.S. Atty., Washington D.C., with whom Stanley S. Harris, U.S. Atty., Washington D.C., at the time the brief was filed, Michael W. Farrell and Charles L. Hall, Asst. U.S. Atty., Washington D.C., were on the brief for appellee.

Before PRYOR and ROGERS, Associate Judges, and REILLY, Chief Judge, Retired.

ROGERS, Associate Judge:

Appellant was convicted by a jury of first-degree murder (D.C.Code §§ 22–2401, –3202), assault with a dangerous weapon (D.C.Code § 22–502), and carrying a pistol without a license (felony) (D.C.Code § 22–3204).[1] On appeal he seeks reversal of his convictions on the grounds that: the trial court erred in admitting evidence of appellant's prior gun possession in the months before the killing; the trial court's failure sua sponte to give any cautionary instruction to the jury on the limited use of such evidence and prior threats evidence was plain error; the trial court erred in denying

---

1. This was appellant's second trial for these offenses, the first having ended in a mistrial immediately before the case was to go to the jury. The history of judicial proceedings is discussed more fully in regard to appellant's specific claims of error.

appellant's motion for judgment of acquittal of first-degree murder on the ground of insufficient evidence of premeditation and deliberation; and the prosecutor's rebuttal closing argument contained an improper bad character inference which substantially prejudiced appellant.

In *Part I,* we summarize the evidence. In *Part II* we hold that the evidence of appellant's prior gun possession, limited in time and circumstance to a period of several months before the killing in connection with a pattern of his threats to kill the decedent, was relevant to his intent and there was no abuse of discretion by the trial court in allowing its admission. In *Part III* we hold that the failure of the trial court sua sponte to give any cautionary instruction on the prior gun possession and prior threats evidence was not plain error, where the relevance of the evidence was properly noted by counsel in their closing arguments, its relationship to issues before the jury was not complex or confused, and defense counsel's decision not to request a cautionary instruction was clearly consistent with his trial strategy. We also hold that there was sufficient evidence of premeditation and deliberation, *Part IV,* and no substantial prejudice to appellant as a result of the prosecutor's rebuttal closing argument, which responded to attacks on a government witness by defense counsel in his closing argument, *Part V.* Accordingly, we affirm.

## I.

The body of Earline Diane Nicks was discovered in the first-floor apartment of appellant and his wife, Gina Mae Jones, at 1246 10th Street, N.W. in the evening on Tuesday, August 19, 1980. Ms. Nicks was appellant's longtime girlfriend,[2] and occupied a basement apartment at that address. The deputy medical examiner estimated the time of death was between midnight Monday, August 18 and noon Tuesday, August 19, 1980; the cause of death was a single .22 caliber bullet fired from six to twelve inches away. The murder weapon was not recovered.

The government called as witnesses George Reid, a neighbor who witnessed an argument between appellant and Ms. Nicks in the early morning hours of August 19 and heard a shot from the apartment in which she was found, and the family and friends of appellant and Ms. Nicks who testified that appellant had threatened to kill her in the late spring and summer months when appellant was seen with a gun. The evidence of appellant's prior gun possession was admitted for limited purposes over his objection.[3] The government's case-in-chief established that the relationship between appellant and Ms. Nicks was violently quarrelsome, and that in the summer of 1980, Ms. Nicks had failed to turn over money owed to appellant, which was the cause of several threats, including, apparently, the one that ultimately resulted in her death.

Ms. Nicks' mother, Lula Nicks, and daughter, Deborah Nicks, testified that two violent arguments occurred while ap-

**2.** Appellant had known Ms. Nicks for many years. They had lived together and had a child, Travis.

**3.** The trial court and counsel discussed the admissibility of this evidence in a series of bench conferences during the first trial. The government proffered that the evidence was admissible to demonstrate appellant's access to the means with which to commit the crime, and further proffered that testimony would link the appellant's possession of the gun to threats by appellant against Ms. Nicks. Without objection by the defense, the trial court permitted the government to introduce evidence of appellant's prior threats against Ms. Nicks. After further discussion during the government's case-in-chief, the trial court permitted the gun evidence to be introduced, over defense objection, for a limited time period as relevant to appellant's motive and intent.

At the beginning of the appellant's second trial, the trial court and counsel reviewed the evidentiary ruling of the first trial. Defense counsel restated his objection to the testimony of prior gun possession. The trial court ruled that the evidence would be admitted as part of a continuing pattern of threats against Ms. Nicks, limited in time to avoid remoteness.

pellant and Ms. Nicks were living with Lula Nicks in 1978 and 1979. During one argument, Lula Nicks had called the police who observed appellant armed with a jackhammer. Deborah Nicks heard appellant threaten her mother with an ashtray, telling her he would "bust her head in;" in another argument, she heard appellant threaten to "blow out her mother's brains." Ms. Nicks' sister, Elaine Harris, also recounted an argument in 1978 between appellant and Ms. Nicks about money when appellant had made a similar threat. She further testified that in July 1980, appellant informed her that Ms. Nicks and his wife had not turned over his money and if he did not get it he would "blow out their brains;" during this conversation, Ms. Harris observed a handgun in appellant's coat. On cross-examination Ms. Harris testified that appellant often threatened Ms. Nicks and often carried a gun, as far back as 1979.[4]

Appellant's next door neighbor, Worth Walker, testified that in the late spring and summer of 1980, he heard several arguments between appellant and Ms. Nicks when appellant threatened to kill her, and he had seen appellant with a gun. On Sunday, August 17, 1980, he observed appellant behind 1246 10th Street pacing back and forth with a gun. On cross-examination, Mr. Walker testified he had seen appellant with a gun numerous (four to five) times.

Ms. Nicks' close friend, Betty Braxton, and son, William Nicks, recounted the argument between appellant and Ms. Nicks on August 17, 1980. Appellant told Ms. Braxton that someone had taken his money and later that day she heard appellant arguing with Ms. Nicks in Ms. Nicks' apartment and threatening to kill her. William Nicks testified that when he arrived at his mother's apartment on August 17, she and appellant were arguing about money and appellant had threatened to kill him and his mother. Ms. Braxton also corroborated earlier testimony that appellant and Ms. Nicks argued and testified, in response to a question about the summer of 1980, that she had often seen appellant with a gun.

The government's key witness was George Reid, who testified he heard appellant shoot Ms. Nicks sometime between 1:00 a.m. and 2:00 a.m. on August 19, 1980. While sitting on his stoop at 1244 10th Street, Mr. Reid saw appellant come out of 1246 10th Street and argue with Ms. Nicks, who was sitting on the stoop of 1246 10th Street. Appellant then re-entered the building and returned with a pistol, which he fired twice into the air, demanding that Ms. Nicks go inside. After they went into 1246 10th Street, Mr. Reid went into 1244 10th Street and listened through a door as the argument continued. He heard appellant knock Ms. Nicks to the floor and threaten her, telling her to get up or he would kill her. A few seconds later a shot was fired, followed by silence. Shortly thereafter Mr. Reid watched appellant remove personal belongings from 1246 10th Street to his car, including a small television and something that could have been a rifle or shotgun, and drive off. Mr. Reid also testified that he had previously heard appellant threaten to kill Ms. Nicks and had occasionally seen appellant going back and forth from his car to his house with a gun. On cross-examination and redirect, Mr. Reid admitted seeing two men who were looking for Ms. Nicks much later that morning and saw them enter the vestibule of her building; he testified, however, that they could not have entered the building past the entrance vestibule because the door leading to the interior of the building was always locked.[5]

---

4. Although the trial court had limited the government's evidence of gun possession to the spring and summer months of 1980, this is one of several instances when the defense elicited on cross-examination evidence of gun possession beyond that introduced by the government.

5. During cross-examination, defense counsel also attacked Mr. Reid's testimony by asking about his drinking. Mr. Reid admitted he drank daily, but denied it affected his recollection of the shooting.

The government also called appellant's sister-in-law, Betty Austin, who testified that appellant had telephoned her on the evening of August 19, and told her he had shot and killed Ms. Nicks during an argument, but had not meant to do it.[6] He also told her he had buried the gun and had others he wanted to bring to her house. The rest of the government's case-in-chief involved events surrounding appellant's arrest on the evening of August 19, after William Nicks saw him in the neighborhood.

Appellant's defense was alibi. He attempted to establish that he was on his way to North Carolina to visit his mother when the murder occurred, and that two men visited Ms. Nicks and killed her after he had left for North Carolina. Appellant did not testify.

Three witnesses recounted the circumstances involving the two alleged killers. Sarah Kelley, who lived at 1244 10th Street, testified that around midnight Ms. Nicks was sitting outside when two men in white tee shirts came by and she went into 1246 10th Street with them. Ms. Kelley then heard arguing, a gunshot, and saw the two men run out of the building.[7] She also testified that Mr. Reid had been drinking that night and was not on the porch when the two men arrived. George Buie and

Delores Lumpkin testified that they were sitting in a car on 10th Street when they saw appellant drive away late in the evening; later they saw two men who were dressed in dark clothes enter the building and heard a gunshot a few minutes later.[8]

The defense also called several witnesses regarding appellant's trip to North Carolina. His foster mother, Ruth Terry, testified that approximately one week before the killing she had asked appellant to come to North Carolina to drive her to a doctor's appointment on August 20, and that on August 19, appellant called to tell her his car had broken down in Virginia.[9] Appellant's neighbor, Michael Marshall, testified that when he saw appellant at a party on August 18, appellant had said he was going to North Carolina; later that evening, around 10:30 or 11:00 p.m., he saw appellant leave and still later, he heard a sound like a gunshot.[10] A family friend of the Nicks', Marian Harris, testified that she had spent most of the evening August 18 with appellant and Ms. Nicks, and did not see or hear any argument between them.

On rebuttal, the government recalled Ms. Braxton, who testified that appellant and Ms. Nicks had never mentioned a trip to North Carolina when she saw them on August 17, and that appellant had not mentioned going to North Carolina when he called her on August 19 around 12:30 p.m.

---

6. During cross-examination, Ms. Austin admitted she had not told anyone of appellant's admission for a full year following the crime, although she had had at least three discussions with police and prosecutors during that year; finally, because of her religion and conscience, she told the prosecutor. She also testified that at the time of the phone call she did not believe appellant.

7. On rebuttal, the government called a police officer who testified that when he had interviewed Ms. Kelley in October 1980, she had denied knowing anything about the August 19 incident.

8. Both Ms. Kelley and Ms. Lumpkin testified one of the two men had a large bush hairstyle. Contrary to Ms. Kelley's testimony, Mr. Buie and Ms. Lumpkin did not see Ms. Nicks outside when they saw the two men. Mr. Buie and Ms. Lumpkin also testified they went to a hotel that night; as part of the government's rebuttal evidence, the hotel owner testified that no one with those names had registered that night and neither had any woman.

9. Government's exhibit number 11, a telephone company record, showed that appellant had not called Ms. Terry until 11:58 a.m. on August 19th.

10. Mr. Marshall testified that Mr. Reid was an alcoholic and had to be helped to bed earlier on

A telephone company employee testified that appellant's telephone call to Ms. Braxton was made from Alexandria, Virginia, and not from Newport News, Virginia, as he had told her.[11] A police officer and the owner of a hotel impeached portions of the testimony of Ms. Kelley, Mr. Buie and Ms. Lumpkin,[12] and appellant's uncle contradicted Mr. Buie's testimony that he had told him about hearing a shot on the night Ms. Nicks was killed.

## II.

Appellant's first contention on appeal is that the evidence of his prior gun possession was "other crimes" evidence, and was only relevant for the improper purpose of characterizing him as a man with a criminal disposition. The government contends that this evidence was properly admitted as evidence of appellant's motive and intent, and to show appellant's access to the means with which to commit the crime.

■ It is well-settled that evidence of prior bad acts which are criminal in nature,

and independent of the crime charged, is inadmissible to prove that a criminal defendant is a person of bad character, and on the occasion charged acted in conformity with his criminal character. *Miles v. United States,* 374 A.2d 278, 282 (D.C. 1982); *Drew v. United States,* 118 U.S. App. D.C. 11, 15, 331 F.2d 85, 89 (1964).[13] Evidence of other wrongful acts is admissible, however, if it is relevant to and probative of one or more of the following issues: (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity. *Drew, supra,* 118 U.S. App. D.C. at 16, 331 F.2d at 90. When offered as relevant to one of these issues, such evidence is not being offered to demonstrate a defendant's criminal disposition and its probative value can outweigh its prejudicial effect. *Id.* The determination of the relevance of such evidence, and whether its probative value outweighs its prejudicial effect, is committed to the discretion of the trial court. *Willcher v. United States,* 408 A.2d 67, 75 (D.C.1979). This court will reverse only where that discretion has been abused.[14]

■ Possession of a gun, without more, is not wrongful conduct, *Fornah v.*

the evening of August 18. Mr. Reid had testified on cross-examination that Mr. Marshall was in the hospital when the killing occurred. On cross-examination, Mr. Marshall admitted he was going to a rehabilitation center for alcoholics, but denied that he had been drinking that night.

11. A cartographer testified that it is a longer drive to Ellerbee, North Carolina (where appellant's mother lived) if one drives first to Newport News than if one drives directly from the District of Columbia. Evidence was presented to show that appellant had bought a tire on August 19 in Alexandria, Virginia.

12. *See supra* notes 7 and 8.

13. In *Drew,* the court reversed a conviction upon finding the joinder of robbery and attempted robbery prejudicial since evidence of one crime could not be used to prove disposition to commit crimes, from which the jury may infer defendant committed the crime charged. The government had repeatedly referred to evidence of a completed robbery to establish that

the defendant probably was involved in an attempted robbery. *Drew* has been cited by this court primarily in cases involving joinder and severance. *Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983); *see, e.g., Bowyer v. United States,* 422 A.2d 973 (D.C.1980); *Bridges v. United States,* 381 A.2d 1073 (D.C.), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1977). The *Drew* analysis has not been used when the circumstantial evidence in and of itself could not be characterized as establishing the criminal behavior. *See Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (in prosecution for carrying pistol without license and possession of marijuana, no error in admitting evidence of hats and stocking masks found in car with guns; no *Drew* discussion); *Wheeler, supra,* 470 A.2d at 770 (*Drew*-type evidence involves acts "minimally in the nature of a criminal offense" and circumstantial albeit strange behavior (ringing doorbells, peering in windows) not sufficiently "criminal" to fall within *Drew's* scope).

14. The nature of the trial court's discretion, its exercise and appellate review is examined in

*United States*, 460 A.2d 556, 562 (D.C. 1983),[15] and the *Drew* analysis is not used where circumstantial evidence "could not be characterized as establishing criminal behavior." *Wheeler, supra* note 13, 470 A.2d at 769. Further, in those instances in which the evidence of appellant's gun possession related to a time just before the murder, the evidence related to the offenses charged, or to an element thereof, and was properly admitted without regard to *Drew. Lee v. United States*, 471 A.2d 683 (D.C.1984); *Smith v. United States*, 312 A.2d 781, 785 (D.C.1973). This court has also held that evidence of a defendant's prior wrongful conduct which is admitted to explain the immediate circumstances surrounding the offenses charged, *Green v. United States*, 440 A.2d 1005 (D.C.1982), or does not prove other crimes were actually committed, *Sweet v. United States*, 449 A.2d 315 (D.C.1982), and which is probative of other issues, is admissible without regard to *Drew*.[16] However, to the extent

the prior gun possession evidence was considered relevant to the pattern of prior threats, it was cast as prior bad act evidence and, as such, it was admissible to show malice and intent. *Calaway v. United States*, 408 A.2d 1220, 1226–27 (D.C. 1979) (evidence of prior conduct is relevant when specific intent is in issue) (citing 1 WHARTON, CRIMINAL EVIDENCE § 245 (13th ed. 1972) );[17] *Fornah, supra*, 460 A.2d at 562 (ownership of murder weapon relevant to malice aforethought and intent); *Rink v. United States*, 388 A.2d 52, 55–56 (D.C.1978); *Belton v. United States*, 127 U.S. App. D.C. 201, 203, 382 F.2d 150, 152 (1967); *Gezmu v. United States*, 375 A.2d 520, 522 (D.C.1977); *see* 1 WHARTON'S CRIMINAL EVIDENCE, *supra*, §§ 168, 201–02 (evidence defendant possessed gun and threatened to kill deceased relevant).[18]

■ The testimony indicated that in the months before the killing, appellant had

---

*Johnson v. United States*, 398 A.2d 354, 362 (D.C. 1979).

> [W]hen the primary focus of the trial court's role shifts from the facts and law to the sound exercise of judgment, the appellate court, in its review capacity, does not render its own decision of what judgment is most wise under the circumstances. Rather, it examines the record and the trial court's determination for those indicia of rationality and fairness that will assure it that the trial court's action was proper.

> In a similar vein, the District of Columbia Circuit has noted that "... even when potential error is brought to the trial court's attention by counsel's objection, much deference will be accorded to that court's discretionary disposition of the matter." *United States v. Lewis*, 224 U.S. App.D.C. 74, 693 F.2d 189, 193 (1982).

**15.** Appellant was only charged with illegally carrying a pistol on August 19, 1980, the date when Ms. Nicks was murdered.

**16.** In *Green, supra*, 440 A.2d at 1007, the defendant sought reversal of his conviction of unlawful possession of marijuana on the ground it was error to admit police testimony that they had observed him make two sales of marijuana

shortly before he was arrested. The conviction was affirmed; the evidence of sales was not admitted to prove defendant's prior wrongful conduct but to explain the immediate circumstances of the arrest. *See also Toliver v. United States*, 468 U.S. 958, 960 (D.C.1983) and cases cited therein. In *Sweet, supra*, 449 A.2d 315, the defendant objected to the complainant's testimony that during the alleged armed rape he had told her he had killed another woman. The court held that the evidence was not "other crimes" evidence because it was not introduced to prove, and did not prove, that other crimes were actually committed; rather it was introduced to show the victim's state of mind. *Id.* at 319.

**17.** In *Calaway, supra*, 408 A.2d 1227, evidence of an assault and robbery which occurred eight years earlier was admitted to show a significantly similar modus operandi, citing *United States v. Bobbitt*, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971) (not abuse of discretion to admit evidence of a threat with a gun 12 years earlier when proof showed that "bad blood" between the defendant and the victim had continued; such evidence admissible to show motive). 2 WIGMORE ON EVIDENCE §§ 305–306 (Chadbourn rev. 1979).

**18.** See *supra* note 3. Since we conclude the trial court properly admitted the evidence as

threatened to kill Ms. Nicks when she had kept money which was owed to him. Of significance is the nature of his threats—to "blow her brains out"—an act normally accomplished by use of a gun. The trial court restricted the government's evidence of prior gun possession to events in the late spring and summer of 1980 to avoid problems of remoteness; there was a probative temporal connection between the evidence of appellant's possession of a gun and his recent threats to kill Ms. Nicks. *See Coleman v. United States*, 379 A.2d 710, 712 (D.C.1977) (trial court has broad discretion as to admissibility of evidence). Elaine Harris testified that a month before the killing appellant was in possession of a gun when he threatened to kill Ms. Nicks for keeping his money, and Worth Walker testified he had heard appellant threaten to kill Ms. Nicks and saw him with a gun just hours before William Nicks witnessed and Betty Braxton heard appellant threaten to kill Ms. Nicks during an argument about the money on the day before the killing. Limited in time and circumstance, the evidence was relevant to show malice, which is one element of intent in a murder prosecution, *Rink, supra*, 388 A.2d at 56.[19]

 Since the murder weapon was not recovered and there were no witnesses to the actual killing, the government's case was based primarily on circumstantial evidence. Although Mr. Reid testified he saw appellant fire a gun twice in Ms. Nicks' presence shortly before the killing, and Ms. Austin testified to his admission of the killing, there was also evidence that two men might have murdered Ms. Nicks. The evidence of appellant's prior gun possession during a recent period, when he was threatening to kill her for keeping his money, was evidence of the seriousness of appellant's threats, and thus was admissible to show malice and intent, even though the probative value of the prior gun evidence was diminished in the absence of testimony to identify the murder weapon as appellant's gun.[20] See *Coleman, supra*, 379 A.2d 710 and *United States v. Blackwell*, 224 U.S. App. D.C. 350, 694 F.2d 1325 (1982), holding that the trial courts did not abuse their discretion in admitting, as more probative than prejudicial, photographic evidence of a defendant's possession of gun five months before the murder (*Coleman*) and five years before defendant was charged with illegal firearms possession (*Blackwell*) where the weapons charged were not recovered.

Moreover, the trial court did not, in our view, abuse its discretion in concluding that the probative value of the prior gun evidence outweighed its potential prejudice. *Punch, supra* note 13, 377 A.2d at 1358.

relevant to appellant's motive and intent, we need not and do not consider the government's alternative argument that the evidence was admissible to show appellant's access to the means of committing the crime.

19. Appellant asserts that any evidence of intent was unnecessary because his alibi defense rendered intent only a technical, not a genuine, issue at trial. He relies on *Campbell v. United States*, 450 A.2d 428 (D.C.1982). In *Campbell*, the defendant was convicted of threats to do bodily harm; at trial the government introduced, as evidence of motive and intent, defendant's prior threats and gun possession. In reversing, this court held that evidence relevant to motive and intent was unnecessary because the defendant denied committing the acts and the government only needed to prove that the accused had uttered words which conveyed fear to the ordinary hearer since he was charged with a general intent crime. *Id.* at 431. Furthermore, the court found there was other, better evidence than defendant's bad conduct seven months earlier to prove the reasonableness of the complainant's fears. Here, in contrast, the government had to prove not only that appellant killed Ms. Nicks, but that he did so with the requisite specific intent required for first-degree murder. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (government must prove every element beyond a reasonable doubt). Intent remains a genuine issue in a murder prosecution where the defense is alibi. *Calaway, supra*, 408 A.2d at 1226–27; *see Belton, supra*, 127 U.S. App.D.C. at 203, 382 F.2d at 152.

20. Mr. Walker testified on direct examination that appellant had a kit from which he could make various types of pistols.

The trial court inquired into the details of prior incidents to determine if they were probative, balanced the factors regarding admissibility and ruled that the government's evidence about appellant's prior gun possession was to be restricted in time and circumstance to a pattern of threats in the spring and summer months before the murder. *Willcher, supra,* 408 A.2d at 75; *cf. Campbell, supra* note 19, 450 A.2d at 432 n. 7 (government's proffer insufficient for trial judge to balance the probative value and prejudicial effect).[21] The trial court also limited the evidence which was admissible during that period in order to eliminate collateral, prejudicial testimony.[22] Thus, the government's witnesses who testified about appellant's gun possession did so only in connection with his prior threats against Ms. Nicks.[23]

Our review of the record indicates that, with the possible exception of a comment in rebuttal argument, discussed in Part V, the government did not make improper use of the evidence to show appellant's bad character. Rather, it used the prior gun possession evidence and the prior threats evidence as tending to show that appellant had a plan or purpose to commit the killing.

*Payne v. United States,* 111 U.S. App. D.C. 94, 96–97, 294 F.2d 723, 725–26, *cert. denied,* 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961); *Tomlinson v. United States,* 68 U.S. App. D.C. 106, 108, 93 F.2d 652, 654, *cert. denied,* 303 U.S. 642, 58 S.Ct. 645, 82 L.Ed. 1102 (1937). Our review of the record also indicates that appellant's trial strategy [24] lessened any prejudice to him as a result of the evidence of prior gun possession; that his strategy was designed to show that appellant always carried a gun does not compel the jury to find in accordance with the inference (that his gun possession was not probative of his intent or premeditation) which he urged upon it. *Leonard v. United States,* 265 A.2d 776, 777 (D.C.1970) (not error to permit jury to give evidence such weight as they thought it deserved in assessing defendant's contention about it).

In these circumstances, we do not find the prior gun possession evidence so inflammatory that the trial court abused its discretion in permitting its admission. *Coleman, supra,* 379 A.2d at 712. Nor can we say after reviewing the record the trial judge's finding that the threats and the gun possession were interrelated and his weighing of the evidence constituted re-

---

**21.** Having presided at the first trial, the trial judge had a good perspective from which to determine whether the evidence of gun possession would create an inference of propensity to commit crime. He commented at the beginning of the second trial that he recalled the case, and he referred during the second trial to his notes of the first trial.

**22.** The evidentiary rulings at the first trial were generally applicable to the second trial. For example, in the first trial the trial court had refused to let Ms. Nicks' mother testify that appellant had a gun in 1979, but limited the government to evidence during a five-month period prior to the murder, relying on *Coleman, supra,* 379 A.2d at 712, and warning counsel to limit their opening arguments to the jury accordingly. The same ruling applied at the second trial and the 1979 gun evidence was not offered. Similarly, evidence that appellant was charged with his brother's murder in 1975 or

1976 was excluded in the first trial; the government was only permitted to inquire whether the witness, who knew of the charge (which was disposed of by plea to carrying a weapon), thought that the appellant's threat to kill Ms. Nicks was serious.

**23.** Although Ms. Braxton testified she saw appellant with a gun "all the time," her answer was in response to a question by the prosecutor directing her attention to the summer of 1980, and not a deliberate attempt to elicit other testimony. Viewing the trial record as a whole, we do not find the statement was prejudicial to appellant. The defense pursued the notion that appellant's behavior was not unusual in view of the history of the parties' relationship and elicited evidence of other and earlier gun possession on cross-examination before and after Ms. Braxton testified.

**24.** *See infra* note 29.

versible error. *See Johnson, supra* note 14, 398 A.2d at 362. The closeness in time and the relationship of the gun possession to appellant's threats toward the decedent are not dissimilar to other cases in which the dangers associated with admission of such evidence have not outweighed its probative value. *Coleman, supra,* 379 A.2d at 712; *see Bobbitt, supra* note 17, 146 U.S. App.D.C. at 227, 450 F.2d at 688. Accordingly, we hold that the evidence of appellant's prior possession of a gun was properly admitted.

### III.

■ Appellant assigns as error the trial court's failure to give any cautionary instruction to the jury on the limited use it could make of the evidence of prior threats and prior gun possession. Had such an instruction been requested in this case, it should and undoubtedly would have been given.[25] But appellant did not request such instruction and also did not object to the instructions which were given to the jury.[26] Appellant must now demonstrate that the trial court's failure to give an instruction was plain error. *Watts v. Unit-*

ed *States,* 362 A.2d 706, 709 (D.C.1976) (en banc); *Fornah, supra,* 460 A.2d at 559.

Appellant contends that a cautionary instruction was required on the limited purposes for which the prior threats and prior gun possession evidence was admitted because of the potential for the jury to use the evidence for the impermissible purpose of demonstrating bad character. The government responds that appellant is, in effect, asking for a per se rule that reversal is required where the trial court has a sua sponte obligation to give a cautionary instruction and fails to do so even in the absence of a request by counsel. Appellant denies this, contending that reversible error occurred, in part because the prosecutor improperly used the evidence to show appellant's disposition to commit crime. Appellant also argues he did not waive his right to a cautionary instruction (by failing to request an instruction or by advising the trial court he was satisfied with the proposed instructions, or by not otherwise objecting to the absence of an instruction when the now complained of evidence was admitted) but even if he did, the error was so prejudicial that this court may review the plain error on its own initiative.[27] In

25. The need for a cautionary instruction on evidence of appellant's prior threat against his wife was discussed at the first trial, out of the presence of the jury, during the government's proffer of the relevance of the threats and gun possession. (This procedure was recommended in *(Charles) Jones v. United States,* 385 A.2d 750, 754 (D.C.1978) ). In the first trial, the government proffered to the trial court that its testimony would show prior assaults with a gun by the appellant against the decedent. However, the court excluded evidence of appellant's threat against the decedent with a gun 18 months before the killing, and the issue of a cautionary instruction did not arise. When the government sought to introduce testimony in the first trial about appellant's argument with his wife over money four days before the murder, the defense objected on the grounds of relevance and the court commented, "[T]o be very careful ... I should give an instruction on this evidence. It may be considered solely in connection with motive and intent." The government indicated it had no objection. Ultimately, at the conclusion of the bench conference, the court told the jury to disregard the evidence; it was not introduced at the second trial.

26. Defense counsel did not request any cautionary instructions on the prior threats and gun evidence or object to the instructions given by the trial court in either of appellant's trials. In the second trial, the trial court reviewed the proposed instructions with counsel using its notes on the instructions at the first trial, and invited counsel's additional requests. Both counsel made requests and the precise wording of several instructions was read by the trial court to ascertain counsel's views. Defense counsel stated before and after the final instructions were given that he was satisfied.

27. With regard to appellant's claim of non-waiver, we note the en banc court's decision of counsel's failure to abide by Super.Ct.Crim.R. 30. *(Linwood) Johnson v. United States,* 387 A.2d 1084, 1086–87 (D.C.1978). Defense counsel in the instant case did not object to the instructions in his motions for mistrial immediately before the case went to the jury and after the instructions were given, or in his motion for judgment notwithstanding the verdict. *See Miles, supra,* 374 A.2d at 283.

addition, he denies there was any tactical advantage to him in failing to request such instructions.

■ This court has held that when prior bad act or other crimes evidence is admitted for a limited purpose, the trial court has a general, sua sponte duty to instruct the jury on the limited purpose for which such evidence is admitted. *Miles, supra,* 374 A.2d at 283; *Green, supra,* 440 A.2d at 1008; *Sweet, supra,* 449 A.2d at 319. The court has declined, en banc, to adopt a per se rule *(Linwood) Johnson, supra* note 27, 387 A.2d at 1087 (overruling *Lofty v. United States,* 277 A.2d 99 (D.C.1971)),[28] and the failure to give a sua sponte cautionary instruction does not necessarily constitute reversible error. *Miles, supra,* 374 A.2d at 283; *Green, supra,* 440 A.2d at 1008; *Gezmu, supra,* 375 A.2d at 523. *Accord Sweet, supra,* 449 A.2d at 319 (no reversible error where instruction was not given on evidence not proving that other crimes were committed). *See also Dixon v. United States,* 287 A.2d 89, 98 (D.C.) ("[T]he wiser approach is to examine on a case by case basis the particular type of evidence sought to be introduced and then determine ... if an immediate cautionary instruction, sua sponte by the trial court, is required to prevent confusion on the part of the jury and thereby to protect the defendant's interest"), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972).

■ The purpose of a limiting instruction is to "confine within legitimate bounds any treatment of the evidence admissible only for special purposes." *Childs, supra* note 28, 194 U.S. App. D.C. at 256, 598 F.2d

at 175. If there is only one issue before the jury, then there is no danger of a spillover into forbidden areas and a limiting instruction would have little or no utility, resulting chiefly in highlighting testimony which the defense might tactically prefer not to have focused on by the jury. *Id.* at 256–57, 598 F.2d at 175–76. Where an alibi defense is presented, intent is not the only issue. Thus, our concern is whether the record in this case indicates that the jury was likely to misuse the prior threats and gun evidence and the failure to give any cautionary instruction was thereby "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra,* 362 A.2d at 709.

■ We conclude that the trial court's failure to give sua sponte any cautionary instruction on the limited use of the evidence of prior threats and gun possession was not plain error. *(Linwood) Johnson, supra,* 387 A.2d at 1086. The same defense counsel, prosecutor and trial judge handled both of appellant's trials on these charges, and both sides had rested prior to the mistrial in the first trial. Consequently, all parties had an opportunity at this second trial to reassess as well as correct any errors or omissions on their part. Moreover, by suggesting that the prior threats and gun possession evidence was, for purposes of the issues before the jury, without significance, or at most suggestive of an accidental shooting, defense counsel's decision not to request any cautionary instructions on the threats and gun evidence was consistent with his trial strategy.[29]

---

28. In *Johnson, supra,* 387 A.2d at 1087 n. 4, this court indicated its disagreement with *United States v. McClain,* 142 U.S.App.D.C. 213, 440 F.2d 241 (1971), where the D.C.Circuit announced a per se rule: "[W]henever evidence is admitted only for a limited purpose, it is plain error, in the absence of a manifest waiver, to omit an immediate cautioning instruction." The Circuit has subsequently confined *McClain* to its facts. *Fench v. United States,* 152 U.S.App. D.C. 336, 470 F.2d 1234 (1972); *Childs v. United States,* 194 U.S.App.D.C. 250, 598 F.2d 169 (1979); *United States v. Lewis, supra* note 14,

224 U.S.App.D.C. at 74, 693 F.2d at 196–97. On its facts, *McClain* is distinguishable from the instant case since the trial court did not, as in *McClain,* rule that the prejudicial effect of the evidence objected to outweighed its probative value.

29. The defense trial strategy was to minimize the significance of appellant's prior threats and gun possession by emphasizing the frequency of his threats and arguments with Ms. Nicks, the decedent, and the many times appellant was seen with a gun. Thus, on cross-examination,

Suffice it to say that the tactical advantage to the defense noted by other courts in similar situations was also present here.[30]

■ As we have noted, gun possession, without more, is not evidence of wrongful conduct. *Fornah, supra,* 460 A.2d at 562. Thus, the analysis in *Sweet, supra,* would suggest that a sua sponte cautionary instruction was not required since the prior gun possession evidence was not offered to, and did not prove prior bad acts or "other crimes". *Sweet, supra,* 449 A.2d at 319 & n. 4 (no possibility that the jury could have made improper use of "other crimes" evidence because such evidence was not introduced to show appellant committed other crimes). However, this case is distinguishable from *Sweet, supra,* since the evidence of prior gun possession was admitted to prove the truth of the matter asserted, that appellant had a gun and made serious threats. Accordingly, our conclusion, that the trial court was not required sua sponte to instruct separately on the gun evidence insofar as it was relevant to intent (including malice), is based on the fact that it was not offered for the purpose of proving appellant's disposition to commit crime but directly to prove an element of the crime with which he was charged. *See Smith, supra,* 312 A.2d at 785; *Lee, supra,* 471 A.2d at 686 (when evidence of one crime is inextricably entwined with the evidence necessary to prove that the accused committed the crime charged, no limiting instruction is required).

■ The evidence of prior threats was prior bad act evidence and was introduced without objection for the limited purpose of proving motive and intent.[31] A cautionary instruction should have been given. Further, as discussed in Part II, the trial court admitted the evidence of prior gun possession, over defense objection, as relevant to the pattern of threats, and to the extent the gun evidence was part of the prior threats evidence, the cautionary instruction should have addressed that evidence as well. Nevertheless, our review of appellant's trial leads us to conclude that the failure sua sponte to give such an instruction was not plain error.

Criminal Rule 30 requires trial counsel to object to proposed instructions so the trial court can be presented with the initial opportunity to consider and address the question being raised. Super. Ct. Crim. R. 30. The record clearly indicates that defense counsel had the opportunity to request cautionary instructions, and did so with respect to the alibi testimony. By indicating his satisfaction with the final instructions, we have no cause to doubt that defense

---

while attempting to impeach the government witnesses with their prior statements, defense counsel elicited testimony that some of the arguments between appellant and the decedent, as well as appellant's prior gun possession, had been unnotable events; they had fought often and not all of the witnesses had considered appellant's prior threats against her serious. Some witnesses expanded upon the number of times they had seen appellant with a gun; of the government's witnesses, Walker testified on cross-examination he had seen the appellant with a gun four to five times, and Harris testified she had seen appellant with a gun many times, as far back as 1979. The defense also brought out that no one had seen appellant directly threaten Ms. Nicks with a gun, or strike her, and that their stormy relationship had existed for a long time. Defense counsel also suggested appellant's gun possession was consistent with his lawful activity as a rent collector.

30. *Bobbitt, supra,* 146 U.S.App.D.C. at 228, 450 F.2d at 689:

> Defense trial counsel sought no instruction. For all we know he may have rejoiced that the trial judge did not make this evidence the subject of an instruction, for any such instruction would not only have presented the view of the trial judge that it was relevant to show motive but would have emphasized the significance of the evidence in the mind of the jury.

*Childs, supra* note 28, 194 U.S.App.D.C. at 257, 598 F.2d at 175:

> It is well known that, even when a limiting instruction is likely to aid the accused's cause, astute counsel may prefer tactically to forego it in the interest of avoiding its inevitable focus of the jury on the unfavorable evidence.

31. *See supra* text accompanying note 18. The trial court's ruling is discussed *supra* note 3 and note 26.

counsel would have requested additional cautionary instructions had he considered it necessary to protect his client's interests. *Cobb v. United States,* 252 A.2d 516, 517 n. 1 (D.C.1969). That he did not do so is some indication that he did not think appellant would be prejudiced in the absence of a cautionary instruction. *United States v. Henson,* 159 U.S. App. D.C. 32, 39 n. 6, 486 F.2d 1292, 1299 n. 6 (1973). It is also apparent that the trial court did not consider cautionary instructions on the prior assaults and gun possession evidence necessary to assure a fair trial; it limited the admission of proffered testimony, reviewed the instructions with counsel, and gave cautionary instructions on prior inconsistent statements and alibi testimony.[32] *Accord Parks v. United States,* 451 A.2d 591 (D.C. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983).

Given the divergent views of appellant's trial and appellate counsel about the potential for prejudice in the absence of a cautionary instruction, we have reviewed the jury instructions in the context of the whole trial. *United States v. Parks,* 421 U.S. 658, 660, 675, 95 S.Ct. 1903, 1905, 1913, 44 L.Ed.2d 489 (1975). Our discussion, in Part II, of how the evidence of prior threats and gun possession was used at trial is also relevant here. In addition, we have taken note of counsel's closing arguments to the jury because, in the absence of a cautionary instruction, the arguments were the most specific comments that the jury heard about how to view the prior threats and gun evidence. *Henderson v. Kibbe,* 431 U.S. 145, 153–54, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (in absence of instruction, closing arguments made clear to the jury the issue it had to decide).

The prosecutor told the jury in his closing argument to consider appellant's prior threats to the decedent in determining whether appellant had the requisite intent to commit murder in the first degree. He commented that the prior threats indicated what led up to the shooting and demonstrated that appellant had the requisite specific intent for first-degree murder, noting that the pattern of threats was evidence of premeditation. The prosecutor's comment on the gun evidence was that appellant was seen with guns during the period of his recent threats to kill; in rebuttal argument, the prosecutor referred to appellant's gun possession in another context and we have considered the rebuttal remark in reviewing the absence of a cautionary instruction. Contrary to appellant's claim, the prosecutor did not argue to the jury that the prior threats or gun possession indicated appellant was the type of bad character who would kill the decedent. Further, we find that defense counsel's closing argument reinforced the idea that the jury should consider the evidence of prior threats in evaluating appellant's intent. Arguing that the threats were inconsistent with proof of appellant's hostile intent towards the decedent, defense counsel drew the jury's attention to the evidence that their arguments about money were nothing new and more consistent with an accidental shooting during an argument than with intentional premeditated murder.[33] Defense counsel also told the jury that the prior gun evidence did not mean anything as far as the killing was concerned; appellant was the rent collector in a tough neighborhood and was only charged with illegal gun possession on August 19, 1980.

---

**32.** The need for a cautionary instruction on proffered threats evidence was considered by the trial court in the first trial. *See supra* note 26.

**33.** Another theme of defense counsel's closing argument was that the evidence was consistent with a robbery. The decedent's apartment as well as that of appellant and his wife were found in disarray after the murder; the door to Ms. Nicks' apartment was broken, and her jewelry was missing. Contrary to Mr. Reid's testimony that he had seen appellant remove property from 1244 10th Street, defense counsel argued that the evidence supported the inference that the two men were implicated in Ms. Nicks' death.

We have also considered what a cautionary instruction would have told the jury. *Henderson v. Kibbe, supra,* 431 U.S. at 154, 97 S.Ct. at 1736 (appraisal of significance of an error in instructions requires comparison of instructions given with those that should have been given, and omission or incomplete instruction less likely to be prejudicial than misstatement of law). Presumably, it would have been similar to Criminal Jury Instruction 2.49,[34] *Green, supra,* 440 A.2d at 1008 n. 7, and, thus, would closely have tracked counsel's closing arguments. Both government and defense counsel focused the jury's attention on the relationship of the prior threats and gun possession to the issue of appellant's intent. Their comments confined the relevance of the gun possession on the day of the murder to the issue of whether he was guilty of the crimes charged. These arguments and our review of the record indicate that counsel properly argued the relevance of the prior threats and gun evidence to the

jury, and the possibility that the jury might use the evidence for impermissible purposes was accordingly lessened.

The relationship of the prior threats and gun evidence to the issues before the jury was not complex or confused,[35] and while intent was techincally not the only issue, the question about identity was substantially diminished by the impeachment of appellant's alibi defense.[36] That the main issue before the jury was appellant's intent was clear from counsel's closing arguments, which focused the jury on the proper relevance of the prior threats evidence to that issue. Moreover, the issues of intent and identity were addressed separately in the closing arguments and the trial court's instructions; the jury could hardly have failed to understand that it had to find that appellant was present at the scene of the killing in order to find him guilty of any of the charges. The trial court also told the jury to consider the evidence separately for each offense and carefully weigh the credi-

**34.** Criminal Jury Instructions for the District of Columbia, No. 2.49 (3d ed. 1978), reads as follows:

> Evidence has been introduced that the defendant. . . .
> This evidence was admitted only for your consideration of whether it shows or tends to show: (*insert any one or more of the following*)
> [a. that the defendant had the intent to commit the offense for which he is now on trial.]
> [b. that the defendant had a motive to commit the offense for which he is now on trial.]
> [c. that the defendant did not commit the offense for which he is now on trial accidentally or by mistake.]
> [d. that the defendant is the person who committed the offense for which he is now on trial.]
> [e. that the defendant had a scheme or plan which included the offense for which he is now on trial.]
> [f. a wish or desire on the part of the defendant to [have sexual intercourse] [gratify his sexual desires] with the complainant.]
> [g. an explanation of the surrounding circumstances of the offense for which he is now on trial.]
> You are not required to accept this evidence and whether you accept it or not is a matter for you to decide. But if you decide to accept it, you may do so only for the limited purpose[s] that I have just explained and you may

> not consider it as tending to show in any other way the defendant's guilt of the offense for which he is now on trial.

**35.** In *Johnson, supra,* 387 A.2d at 1087, this court noted that in *Dixon, supra,* 287 A.2d at 89, the "high probability of jury confusion" required the exceptional use sua sponte of an immediate cautionary instruction. "[W]hile a per se instruction rule might be appropriate under circumstances where the government claimed surprise at its own witnesses' testimony and sought to introduce a prior inconsistent statement of that witness, such a rule was unnecessary where such surprise, and attendant jury confusion, was lacking." *Accord Forbes v. United States,* 390 A.2d 453, 457 (D.C.1978).

**36.** Contrary to appellant's assertion that his alibi defense was unimpeached, Reply Brief at 10, the record is clearly to the contrary. Not only did the government's witnesses testify that appellant was in the immediate area of the murder at the critical time, but one, Ms. Austin, testified that he admitted doing the killing. Even his own witnesses placed him at his apartment building at two critical times, very late at night on August 18 and the next day, when his alibi was that he was on his way to North Carolina. Furthermore, the defense witnesses contradicted each other on significant points and their testimony was impeached by the government's rebuttal evidence.

bility of the witnesses' testimony; it twice defined the different intents required for first and second-degree murder and involuntary manslaughter while armed. *Accord, Goins v. United States,* 475 A.2d 362, at 365 (D.C.1984) (" 'propriety of the trial court's instructions is to be determined from the whole of the charge, rather than through scrutiny of isolated sentences or passages' ") (quoting *Charles v. United States,* 371 A.2d 404, 408 (D.C.1977)); *Cupp v. Naughten,* 414 U.S. 141, 144, 146–47, 94 S.Ct. 396, 399, 400, 38 L.Ed.2d 368 (1973); *Parks, supra,* 421 U.S. at 675, 95 S.Ct. at 1913 (in light of the evidence adduced at trial, failure of the trial court to give sua sponte an instruction not plain error since "the jury could not have failed to be aware [of] the main issue for determination...."); *Watts, supra,* 362 A.2d at 709 (view instructions as a whole).

Viewing the trial as a totality, we find misuse of the evidence unlikely. *Sweet, supra,* 449 A.2d at 99. The jury was effectively insulated from bad character evidence by the trial court's rulings on the admissibility of evidence and the manner in which the case was tried. The government's evidence presented a strong circumstantial case, *see Green, supra,* 440 A.2d at 1008, and the defense made conscious tactical decisions "to air fully" the evidence about prior threats and gun possession and to limit requests for cautionary instructions. *Miles, supra,* 374 A.2d at 283. Accordingly, we conclude that the failure of the trial court sua sponte to give a cautionary instruction on the prior threats and prior gun possession was not plain error.

37. Appellant moved for a judgment of acquittal on the charge of first-degree murder when the government rested its case and at the close of all the evidence. The trial judge denied both motions.

38. D.C.Code § 22–2401 (1981) provides:
Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate

## IV.

 Appellant also argues there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction.[37] The appropriate standard of our review is "whether there was sufficient evidence from which a reasonable juror could fairly conclude guilt beyond a reasonable doubt." *Head v. United States,* 451 A.2d 615, 622 (D.C.1982). In applying this standard, we do not distinguish between direct and circumstantial evidence. *Jackson v. United States,* 395 A.2d 99, 102 (D.C.1978); *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978). We also review such claims in the "light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Hall v. United States,* 454 A.2d 314, 317 (D.C. 1982); *Curley v. United States,* 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). This court can reverse only where the government has produced no evidence from which a reasonable mind might infer guilt beyond a reasonable doubt. *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979).

 In a first-degree murder case the government has the burden to prove that an intentional killing was done with premeditation and deliberation.[38] *Id.* at 371, citing *Harris v. United States,* 375 A.2d 505, 507 (D.C.1977) (quoting *Austin v. United States,* 127 U.S.App.D.C. 180, 188, 382 F.2d 129, 137 (1967)). This court has formulated the burden of proof as follows:

To prove premeditation, the government must show that a defendant gave

any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in § 22–401 or 22–402, rape, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree.

'thought, before acting, to the idea of taking a human life and [reached] a definite decision to kill.' *United States v. Sutton,* 138 U.S.App.D.C. 208, 216–17, 426 F.2d 1202, 1210–11 (1969) (footnote omitted) (quoting *Austin, supra,* 127 U.S.App.D.C. at 186 n. 12, 382 F.2d at 135 n. 12). Deliberation is proved by demonstrating that the accused acted with 'consideration and reflection upon the preconceived design to kill; turning it over in the mind, giving it second thought.' *Id.* (footnote omitted). Although no specific amount of time is necessary to demonstrate premeditation and deliberation, the evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity. *See Harris, supra,* 375 A.2d at 509; *Peterson, supra,* 166 U.S.App.D.C. at 79, 509 F.2d at 412; *Austin, supra,* 127 U.S.App.D.C. at 187, 190, 382 F.2d at 136, 139.

*Frendak, supra,* 408 A.2d at 371.

 We hold the case was properly submitted to the jury. The government's theory of the case was that appellant and Ms. Nicks fought over money and that defendant did what he said he was going to do: he killed her because she did not give him his money. In the absence of an eyewitness to the actual shooting and a murder weapon, the government presented evidence of appellant's motive and the manner and circumstances of the death. Appellant's threats to kill Ms. Nicks for having his money were evidence of motive, and supported an inference of premeditation and deliberation. *Hall, supra,* 454 A.2d at 317 (presence of motive suggests a purposeful or reasoned killing); *Frendak, supra,* 408 A.2d at 371; *Austin, supra,* 127 U.S.App.D.C. at 189, 382 F.2d at 138. Furthermore, appellant's actions on the day before the murder—when Ms. Braxton heard appellant arguing with the decedent about money and Mr. Walker saw him pacing back and forth with a gun, and, even, in view of the impeachment, appellant's plan to go to North Carolina—were also evidence from which the jury could infer that he did not act impulsively.

 Additionally, there was evidence that appellant, during his argument with Ms. Nicks shortly before her death, had returned to his apartment and procured a loaded pistol and then come back outside where he assaulted her and forced her to return to the apartment. This, in itself, is highly probative of premeditation and deliberation. *Hall, supra,* 454 A.2d at 318; *Frendak, supra,* 408 A.2d at 371. That he rejoined Ms. Nicks armed with a loaded, working pistol permits the inference that he ordered her into the apartment with a calculated intent to kill. *Hall, supra,* (defendant bringing murder weapon to scene permits inference he " 'arrived on the scene already possessed of a calmly planned and calculated intent to kill' ") (quoting *Belton, supra,* 127 U.S.App.D.C. at 203, 382 F.2d at 152). Since no fixed time is required for a finding of deliberation, evidence that appellant threatened to kill decedent only seconds before shooting her is not dispositive of the issue.[39] The evidence of premeditation was sufficient, in view of appellant's prior threats and his retrieval of a loaded gun before the shooting.

 The evidence of appellant's threats and gun possession in the months before the killing was for the jury to consider in determining whether appellant had premeditated and deliberated the killing; it did not make the inference impermissible. *Belton, supra,* 127 U.S.App.D.C. at 203, 382 F.2d at 152; *see Fornah, supra,* 460 A.2d at 562. A contrary inference was presented

---

39. A conditional threat is not inconsistent with evidence of premeditation and deliberation. Wharton's Criminal Evidence, *supra,* § 202. Moreover, in *Frendak, supra,* 408 A.2d at 372 n. 9, this court distinguished *Austin, supra,* and *Hemphill v. United States,* 131 U.S.App.D.C. 46,

402 F.2d 187 (1968), by noting that the victims were killed with multiple blows, which suggested the murders were committed in the heat of passion. The court affirmed the conviction of first-degree murder in *Frendak* where the victim was shot twice.

to the jury by the defense and the jury also heard Ms. Austin's testimony that appellant had told her he had not meant to kill Ms. Nicks. The trial court instructed the jury on murder in the first and second degrees, as well as involuntary manslaughter, so the jury had the opportunity to consider the different intent required for each offense.[40] Appellant's self-serving statement to his sister-in-law, Ms. Austin, is not, in itself, a sufficient basis on which we can conclude that a reasonable jury must have had a doubt as to premeditation and deliberation. *Curley, supra,* 81 U.S. App.D.C. at 394, 160 F.2d at 237.

V.

■ Appellant's final assignment of error concerns a portion of the prosecutor's closing argument in rebuttal. Appellant argues that the prosecutor, in defending Mr. Reid's credibility, improperly suggested that Mr. Reid might be afraid of appellant, thereby describing appellant as a man of violent, criminal disposition. Appellant did not object to the prosecutor's argument so he must demonstrate it was plain error. *Watts, supra,* 362 A.2d at 709.

■ The crucial factors in evaluating the impact of prosecutorial misconduct are the closeness of the case, the centrality of the issue affected, whether there was defense objection, and the steps taken by the trial court to mitigate the error. *Fornah, supra,* 460 A.2d at 560; *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969); *Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976). Accordingly, in reviewing this claim of error we have considered the scope and purpose for which the government used the testimony about guns, as well as the impact of this testimony and the comment during the rebuttal argument on the entire trial. *See Fornah, supra,* 460 A.2d at 559 (quoting

*Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974)).

■ The issue allegedly affected by the prosecutor's rebuttal comment—appellant's character—was not a central issue at trial. *Miles, supra,* 374 A.2d at 283–84. Appellant presented a defense of alibi and did not testify, thereby not placing his character in issue. As we have stated in Parts II and III, the prior gun possession evidence was not introduced to demonstrate appellant's bad character but to demonstrate his intent. Although the prior threats evidence is subject to improper use by the jury on the issue of character, the use of that evidence at trial and in the prosecutor's closing arguments was not improper. Further, the portion of the prosecutor's rebuttal argument to which appellant objects did not address that evidence.

In closing argument, defense counsel directly and indirectly attacked at length the government's key witness, Mr. Reid, by raising questions about his credibility ("his extraordinary story ... is simply not credible...."), his character (claiming Mr. Reid had lied about being an alcoholic and was very antagonistic—"Is that the kind of person you would believe?"), and motives (suggesting Mr. Reid was protecting the two men who were looking for Ms. Nicks). The prosecutor commented in rebuttal that there was no evidence that Mr. Reid had a motive to fabricate and suggested he was unlikely to lie about a man (appellant) who carried guns.

Given the strong attack on Mr. Reid by defense counsel in closing argument, when the issue of Mr. Reid's fear was first raised, the defense opened the door for the prosecutor properly to meet the attack. *Medina v. United States,* 315 A.2d 169 (D.C.1974). That his comment about guns might better have been left unsaid, *Sellars*

---

40. The jury is presumed, in the absence of evidence to the contrary, to have understood and followed the court's instructions. *Parker v. Randolph,* 442 U.S. 62, 73–74, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979); *Christian v. United*

*States,* 394 A.2d 1, 23 (D.C.), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1978). Nothing in the record indicates the jury failed to do so here.

*v. United States,* 401 A.2d 974, 977 (D.C. 1979), does not cause us to conclude that it was plain error. The comment was a passing remark (a few sentences) in the course of a rebuttal argument (14 pages) that focused on the weaknesses of the alibi defense by reviewing the numerous contradictions in the defense witnesses' testimony. The prosecutor's references in rebuttal to two government witnesses were designed to draw the jury's attention to the reasonableness of their delayed actions and the absence of evidence of bias: he noted that Mr. Reid had hesitated about telling the police what he had seen and had to be convinced to do so by his neighbors, and that Ms. Austin had not told the police of appellant's confession to her for a year, not because she was biased against him, but because he was her brother-in-law. It was in the course of this discussion that the prosecutor responded to the defense suggestion that Mr. Reid had a motive to point the finger at appellant.

The prosecutor's comment was near the end of his rebuttal argument, and was apparently not given much significance by defense counsel who did not object (*see Parks, supra,* 451 A.2d at 613). It was followed by the trial court's instruction that the statements of counsel are not evidence. *Arnold v. United States,* 467 A.2d 136, 138 (D.C.1983).[41] Moreover, although the government's evidence was circumstantial, the testimony of its witnesses, including Mr. Reid, remained strong. The alibi defense was seriously impeached through cross-examination and rebuttal evidence, as well as by the contradictions in the defense witnesses' testimony on direct examination. Under these circumstances, assuming error, we find upon application of the balancing test enunciated in *Villacres, supra,* 357 A.2d at 423, that the verdict "was not substantially swayed by the comment." *(Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

Accordingly, the judgment below is affirmed.

---

**41.** As the Supreme Court has cautioned,
[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.
*Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–73, 40 L.Ed.2d 431 (1974).