**Abdus–Shahid M.S. ALI a/k/a James C. Long, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 86–64, 86–733, 89–90.**

District of Columbia Court of Appeals.

Argued May 30, 1990.
Decided Oct. 16, 1990.

---

Lawrence M. Baskir, appointed by the court, for appellant.

James A. Meade, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, and Helen M. Bollwerk, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, BELSON and STEADMAN, Associate Judges.

BELSON, Associate Judge:

Appellant Abdus–Shahid M.S. Ali challenges his conviction for first-degree murder while armed in violation of D.C.Code §§ 22-2401, –3202 (1989) on numerous grounds. His principal contentions are that the trial court erred in that it permitted appellant to represent himself at trial, admitted irrelevant testimony concerning a shotgun unconnected with the crime as well as photographs of that shotgun, gave inadequate jury instructions, and denied appellant's motions for new trial.[1] We reject each ground for reversal, and affirm.

---

1. Appellant also contends that the government's impeachment of appellant with his prior murder conviction, questioning of a character witness on his personal knowledge of facts underlying the prior conviction, and closing arguments were improper. We address these arguments in note 29.

## I.

Appellant was previously convicted of first-degree murder in 1964, and served a sentence of 20 years.[2] Approximately one year after his release, appellant committed the murder charged in this case. Following a trial by jury, appellant was convicted of first-degree murder while armed for the February 3, 1985 murder of Dwayne[3] Lovells, this time receiving a sentence of 20 years to life in prison. Lovells owed appellant a debt for which Lovells paid with his life after suffering a blast at short range from a sawed-off shotgun. The government's theory at trial was that the victim owed appellant a debt for drugs appellant gave to the victim to turn over quickly for a profit to finance appellant's plan to open a health food store. Appellant testified that he loaned the victim $500 to pay bills and that the victim repaid all but $50. Dwayne Lovells died with $40.00 in his wallet.

Appellant did not commit this murder unassisted; his cousin Vanessa Conway set up appellant's meeting with his victim Lovells—ostensibly to enable Conway to purchase drugs from Lovells—and appellant's friend Marshall Manning drove Manning's blue pick-up truck from which appellant emerged to talk with Lovells before pulling the sawed-off shotgun from his coat to shoot him to death near the corner of 12th and Franklin Streets, N.E., in the District of Columbia. Conway and Manning, among others, testified against appellant at trial.

The government's evidence demonstrated that following the shooting appellant got out of Manning's truck near Conway's apartment with a bag, and asked Conway to take the bag to his friend Larry Cannon in exchange for $500 worth of pure cocaine. Conway testified that appellant did not want her to carry the bag and that appellant carried it from her apartment and put it into the trunk of his car which Conway drove to Larry Cannon's. The rest of appellant's evening was spent first with his parents, then at his cousin Vanessa's residence until 5 a.m. the next day.[4] Once appellant learned on February 5, 1985 that there was a warrant for his arrest for the murder of Lovells, he fled to nearby Virginia with Mary Dickens and her son. There he was apprehended by police on March 13, 1985.

## II.

A jury found appellant guilty of first-degree murder while armed on March 12, 1986.[5] Appellant was sentenced to 20 years to life in prison on April 22, 1986. Appellant noted his direct appeal on April 30, 1986 (No. 86–733). Appellant's *pro se* motion for a new trial[6] dated May 7, 1986

---

**2.** *Long v. United States,* 124 U.S.App.D.C. 14, 360 F.2d 829 (1966).

**3.** The indictment referred to the victim as "Duane" Lovells. Because the parties now refer to the victim as "Dwayne" Lovells, this opinion does so as well.

**4.** The witnesses differed widely as to the time appellant and one of his girlfriends, Willie Mae Smith, arrived at appellant's parents' home on Sunday evening, February 3, 1985. Appellant: 9:10 or 9:15 p.m.; appellant's father: 8:35 p.m.; appellant's mother: 8:50–8:55 p.m.; Sadie Lewis, neighbor, testified she spoke with appellant at his parents' at 8:30 or 8:45 p.m.; her daughter testified that (in the same call) she called appellant at 9:25 p.m. and spoke with him for 25 minutes; Vanessa Conway: appellant did not leave her place for appellant's parents' until after 10:00 p.m.–10:30 p.m.; Willie Mae Smith: after 10:00 p.m. Dwayne Lovells was shot at approximately 9:24 p.m. that evening.

**5.** Following his December 5, 1985 indictment for Lovells' murder but before trial, appellant filed three *pro se* motions entitled "Motion for Correction of Name on Record; Motion for Discharge from Custody by Verture (*sic*) of False Information on Warrant; Motion for Bond Pending Indictment and Trial." Appellant's motion to change his name on the record was granted while the others were denied by Judge Ugast. From those denials, he noted an appeal on December 24, 1985 (Appeal No. 86–64). Appellant's appellate counsel informed the court at oral argument that appellant no longer presses these matters in light of their mootness, and accordingly withdrew Appeal No. 86–64.

**6.** The appellant's motion was captioned, "Motion To Vacate Arrest—Set A Side Judgment—For A New Trial: On The Grounds Of Newly Discovered Evidence, Insufficiency Of The Evidence—Beyond Reasonable Doubt, Misdirection of Jury—Via Improper Influencing And The Vindictiveness—Prosecutorial Miscon-

was denied by Judge Nunzio on July 25, 1986 as untimely. Appellant failed to note his appeal from this order because he apparently did not receive a copy of the order while in prison as he had been moved from one facility to another. On July 29, 1987, appellant filed a second motion for new trial, incorporating a motion to appoint appellate counsel as counsel on the motion and a motion for authorization for investigative services, and also filed a motion to vacate and re-enter the July 25, 1986 order to enable appellant to note his appeal through his appointed counsel. Judge Nunzio denied the July 29, 1987 motion for new trial, but vacated and re-entered his July 25, 1986 order on January 17, 1989.[7] Appellant then noted timely appeals of the denials of the May 7, 1986 and July 29, 1987 motions for new trial (No. 89–90). These three appeals were consolidated for consideration by this court.

### III.

■ On appeal appellant argues first that he was not fully apprised of the dangers and disadvantages of representing himself in this complex case and thus did not make a knowing and voluntary waiver of his right to counsel. Although the court made inquiries of appellant before granting the waiver, appellant asserts that they were merely a "litany of questions and answers" that failed to get to the substance of the dire consequences to which appellant exposed himself by his choice to represent himself, and did not amount to the requisite "searching inquiry." Appellant's involvement in his previous murder trial, together with his independent reading of opinions in murder cases, did not constitute, in appellant's present view, sufficient experience in litigation to permit him to represent himself adequately. Thus, appellant contends, the court erred when it permitted him to represent himself at trial.

The government responds that appellant's decision to participate actively in his own defense was made knowingly and intelligently, and that the quality of his decision was ensured by the trial court's searching inquiry of appellant. The government posits that the inquiry to which appellant responded was more thorough than the inquiry made of the appellant in *Abney v. United States*, 464 A.2d 106 (D.C.1983), and approved by us in that opinion. It goes on to argue that even if this court finds that the trial court did not conduct an adequate inquiry, circumstantial evidence supports the conclusion that appellant's decision to play a role in his own representation was nevertheless knowing and voluntary, accompanied as it was by initial discussions with counsel and the continuing availability of standby counsel. Finally, according to the government, appellant's technical legal skills were not relevant to the trial court's assessment of appellant's ability to represent himself and the court's determination that the waiver was knowingly and intelligently made.

A constitutional right to conduct one's own defense is implied in the Sixth Amendment. *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). The Supreme Court in *Faretta* cautioned, however:

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson v. Zerbst*, 304 U.S. [458], at 464–465 [58 S.Ct. 1019, at 1023, 82 L.Ed. 1461 (1938)]. Cf. *Von Moltke v. Gillies*, 332 U.S. 708, 723–724 [68 S.Ct. 316, 323–324, 92 L.Ed. 309 (1948)] (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that

---

duct. Coupled With Ineffective Assistance— Due Process On The Part Of Cocounsel."

7. The January 17, 1989 order noted that it re-entered its July 26, 1986 order. The January 17 order also granted the motion for appointment of Lawrence M. Baskir as counsel.

the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. [269], at 279 [63 S.Ct. 236, at 242, 87 L.Ed. 268 (1942)].

422 U.S. at 835, 95 S.Ct. at 2541.

This court in *Hsu v. United States,* 392 A.2d 972 (D.C.1978) quoted the "script" fashioned by Justice Black which is to be followed by trial judges when they undertake to ensure that a defendant's waiver of his Sixth Amendment right to the assistance of counsel is knowing and intelligent:

To be [made] valid such waiver [of counsel] must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandably and wisely made only from a penetrating and comprehensive examination of all the circumstances....

*Id.* at 983 (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 323–24, 92 L.Ed. 309 (1948) (plurality opinion)). Although reversal is not mandatory if the script is not followed, "absent virtually the complete inquiry prescribed by Justice Black, the appellate courts cannot uphold the finding of a valid waiver unless the inquiry of record is buttressed by a compelling case of circumstantial evidence that the *pro se* defendant knew what he or she was doing." *Hsu, supra,* at 983.

Our review of the trial transcript demonstrates that Judge Nunzio fully examined appellant concerning his decision to participate in his own representation as required by the case law. The trial court noted initially that:

The key issue would be, gentlemen, Mr. Ali representing himself. I have no problem with it. We have to go through a dissertation of questions, Mr. Ali. I have in the past and it has been my policy not to choose one or the other, to question and deny you to represent yourself or alternatively to be satisfied with it and say that you are it and you are not entitled to any other counsel.

The trial judge then stated that the hybrid procedure that had proven successful for him in the past was to have the defendant be lead counsel, but to have the assistance of an attorney as a back-up. Then, the court stated, "I think that we can do the same thing here if I am satisfied that you can handle it yourself. Okay? Mr. Ali: Yes, sir. THE COURT: All right. Because if indeed that's what you want, I will give it to you. You cite the case and the government cites the case.... that it calls for a questioning." [8]

8. The colloquy between the appellant and the court proceeded as follows:

THE COURT: Mr. Ali, will you please stand up because I must ask you some questions and if I fail to cover them all, Mr. Stern or Mr. Peterson help me out here because according to the law to be a valid such waiver of your right to counsel, it must be made with an apprehension of the nature of the charges.

Now, are you aware of what your are being charged with right now?

MR. ALI: Yes, sir.

THE COURT: What is that?

MR. ALI: First degree murder.

THE COURT: As I recall the record reflects that you have been convicted of first degree murder; right?

MR. ALI: Yes.

THE COURT: You have served twenty years so you certainly know—

MR. ALI: Twenty years and sixteen days.

THE COURT: So, you must know what the nature of the charges against you and it is another first degree murder case.

MR. ALI: Yes, sir.

THE COURT: The statutory offense is included within them and I guess it would be what the lesser included which would be second degree murder. It is twenty to life to mandatory on first degree and on second degree murder unless they have changed it, Mr. Peterson, it can well be twenty to life or not to exceed twenty years.

MR. PETERSON: It would be fifteen to life.

THE COURT: Fifteen to life on the second. Do you understand this now?

MR. ALI: Yes.

THE COURT: So, you know that this is the statutory time on the other lesser offense if indeed that is what you are found guilty of. The possible defenses to the charges and the circumstances in mitigation thereof and are you aware of all the possible defenses available and have you discussed these over with Mr. Hille-

Subsequent to the trial court's examination of appellant under *Faretta, Von Moltke* and their progeny, the court returned to questions concerning the procedural aspects of the trial, such as opening statements and examination of witnesses. Then, after discussing how appellant and Mr. Hillegas would handle the trial, the trial court stated that, "I am satisfied that you understand everything. And I think that we have satisfied the *Abney* case, that you have a penetrating knowledge and a comprehensive distinctive understanding of the circumstances of about what we are into and namely, a first degree murder trial and representing yourself."

Having reviewed the trial transcript, we conclude that the trial court complied with the requirements of our case law under *Hsu, supra,* by asking the full range of questions suggested by Justice Black in *Von Moltke, supra. See also Abney v. United States,* 464 A.2d 106, 107 (D.C. 1983); *Fowler v. United States,* 411 A.2d 618, 623 (D.C.), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). Us-

gas? I am sure that you—if you did do it, it was self-defense, et cetera, et cetera but Mr. Hillegas, have you discussed any of this with him?

MR. HILLEGAS: Yes, Your Honor.

THE COURT: Are you satisfied that he understands the possible gamit (*sic*) of the defenses, the mitigation, et cetera?

MR. HILLEGAS: Yes, Your Honor.

THE COURT: Are you sure, Mr. Ali?

MR. ALI: Yes, Your Honor, I am.

THE COURT: Have you done any reading on the subject matter?

MR. ALI: Yes, I have.

THE COURT: Because few come forward and say that they want to represent themselves. Exactly what have you studied by way of reading, because you are the one that is requesting that you represent yourself.

MR. ALI: Well, as you said, I have done twenty years and I applied the sixteen days. I have studied quite a bit particularly murder cases within this last year.

THE COURT: And the defenses thereto?

MR. ALI: Yes.

THE COURT: I am not asking what your case is but I just want to make sure that you know what your are handling here because it is not just standing moot and making the government prove it, because if you are going to defend yourself, you should know the rank of the defenses that are available and which ones you may be choosing and how to approach it. Do you understand that?

MR. ALI: Yes, sir.

THE COURT: Do you feel that you are at least academically fortified to handle this?

MR. ALI: Well, I feel—.... Yes, I feel that I have the academic guidance to do it. I do not say that I am in any way cognizant of all the things that are necessary. That is definitely the reason for Mr. Hillegas.

THE COURT: That's why you would prefer a hybrid type of thing yourself plus Mr. Hillegas?

MR. ALI: Yes, because I realize that there are some deficiencies in my knowledge. I am not proficient to the degree that I am a government attorney.

THE COURT: Sir, you must understand though that once I accept you, you become lead counsel. If indeed there is a disagreement between you and Mr. Hillegas as to how to approach something, I will look to you.

MR. ALI: Yes. So far we have discussed the situation and we have come to an agreement pretty fairly and easily on a given subject.

THE COURT: The point is that I will look to you as the lead counsel from here on in.

MR. ALI: Yes, sir.

THE COURT: All right.

Although the trial court appeared to accept appellant as lead counsel at this point, the trial court went on to discuss how the trial would be handled by appellant and his backup counsel Mr. Hillegas. Then, the trial court again questioned appellant about his past experience with the criminal justice system.

THE COURT: [Do] you understand the entire gambit (*sic*) of the jury instructions? I take it that you have looked at some jury instructions of that nature and Mr. Hillegas has given you his counsel and advice on the subject.

MR. ALI: I have looked at some jury instructions.

THE COURT: Your first case, was it a plea or a trial?

MR. ALI: It was a trial.

THE COURT: Okay. So, in other words you are familiar with the process but it has changed somewhat over the twenty years.

MR. ALI: Well, because of the ultimate, I think—I would say that it was a case where I had an alibi defense. I ended up being on the insanity offense against my will I might say.

THE COURT: Okay.

MR. ALI: And I recognize the circumstances of this case and I recognize should I be found guilty that I face only another shot at the community until I am some sixty some years old. So, I feel that if I am to go through this, I feel that I want to have something to say. If I am convicted of this charge, which I definitely am not guilty of, that I want to have something to say that I feel that I should have something to say in my defense of me. I have become very confident in Mr. Hillegas over the period of time and he is certainly working with me to the best of his ability and with what we have to work with to try to bring to light to this Court and to the jury that I am not guilty of those charges.

ing these questions and answers, Judge Nunzio made a full inquiry before reaching his determination that the appellant knowingly and voluntarily waived his Sixth Amendment right to counsel in order to assert his right to self-representation to the extent appellant was asserting it.[9] Appellant's present argument that he lacked the technical trial expertise to conduct his defense also fails because such "technical legal knowledge" is not a legal prerequisite to a defendant's assertion to his constitutional right to self-representation. *See Faretta, supra,* 422 U.S. at 836, 95 S.Ct. at 2541–42: *Hsu, supra,* 392 A.2d at 984. Accordingly, we uphold the trial court's finding of a valid waiver.[10]

## IV.

■ We turn next to appellant's challenge to the admission into evidence of descriptions and photographs of a shotgun that was not clearly shown to have been used in the killing, and of some accompanying shells. The sawed-off shotgun that killed Lovells was apparently never recovered by the government. In order to prove that appellant had possession of the type of shotgun that was used in the murder, the government successfully offered for admission into evidence photographs of a sawed-off shotgun and shotgun shells that witness Mary Dickens identified at the police station as being similar to those she saw in appellant's possession in early January, 1985. Appellant asserts that Dickens' testimony and the photographs were erroneously admitted into evidence. He urges that this evidence was highly prejudicial and should have been excluded, or, in any event, should have been the subject of a *Drew* hearing.[11] We disagree.

The government contends that the evidence concerning the sawed-off shotgun that was in appellant's possession prior to the murder was properly admitted because, under some circumstances at least, evidence of an appellant's possession of a gun before the commission of a crime cannot be considered evidence of other crimes under *Drew.* The government argues that there was a clear connection between the gun that Dickens saw in appellant's possession before Lovells' murder and the sawed-off shotgun that killed Lovells. The government introduced the testimony of Dickens and the photographs of a sawed-off shotgun from the police arsenal to demonstrate the type of weapon seen in appellant's possession and then placed in a duffel bag a few weeks prior to the murder.[12] This tied in with testimony that appellant was seen on the night of the murder with a similar bag that may have contained the murder weapon. Because the evidence was relevant, states the government, it was within the trial court's discretion to permit its admission into evidence.

Entirely apart from *Drew* considerations, appellant argues that the evidence concerning the earlier possession of a sawed-off shotgun, and in particular the photographs, was not factually linked to the crime charged, and thus was in effect irrelevant. Appellant relies in part on *Burleson v. United States,* 306 A.2d 659 (D.C.1973) to argue that there was no connection between the gun Dickens saw in appellant's possession prior to the murder, and the police photographs of the gun and ammunition that Dickens identified as being similar to those she saw in appellant's possession in early January, 1985. *Burleson,* however, is distinguishable because in that case

**9.** We observe that while the trial court may, in the exercise of discretion, permit a defendant to participate in his or her own defense pursuant to a hybrid or standby counsel arrangement, the defendant has no right to do so. *Griffin v. United States,* 447 A.2d 776, 778–79 (D.C.1982), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983).

**10.** Because we conclude that the trial court made a searching and thorough inquiry of appellant on the record, we need not determine whether circumstantial evidence establishes that

appellant knew what he was doing. *See Hsu, supra,* 392 A.2d at 983.

**11.** *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

**12.** The record amply demonstrates that the jury could not have confused Ms. Dickens' identification of the type of weapon from the police arsenal as an identification of *the* murder weapon.

there was virtually no evidence connecting appellant to the .38 caliber revolver found under the passenger seat of his brother's car five hours after the assault and more than twelve blocks from the scene of the crime. In the instant case, there unquestionably was evidence connecting appellant with a sawed-off shotgun on both occasions in question. A few weeks before the murder Dickens saw appellant with a sawed-off shotgun and ammunition in the home they shared. On the night of the murder, a similar red shotgun shell was found at the murder scene. A witness identified appellant as the person who killed Lovells with a shotgun. Appellant had placed the gun that Dickens saw in a bag, and was seen carrying a similar bag the night of the murder. Dickens was able to identify the type of gun and ammunition from the police arsenal. Thus, the connection in this case between appellant and the gun Dickens saw does not rest upon unwarranted inference as did the defendant's relationship to the gun that figured in *Burleson*. As the court in *Burleson* noted:

> Real or visual evidence, like any other evidence, is admissible if it has some evidentiary value on some issue in the case, but it is not admissible if it is incapable of affording a reasonable inference as to a matter in dispute. The evidence must have some connection *with the defendant or the crime with which he is charged,* and should not be admitted if the connection is too remote or conjectural.

*Id.* at 661 (emphasis added). The evidence at issue here satisfies this standard of admissibility. Any uncertainty that the gun seen by Dickens was the same gun that appellant used to kill Lovells would go to the weight of the evidence rather than its admissibility. *See id.* at 661.

■ We turn next to appellant's argument that admission of the evidence concerning appellant's previous possession of a sawed-off shotgun violated the principles of *Drew, supra.* The government meets this argument at the threshold with the contention that as a matter of law appellant's possession of a sawed-off shotgun on the prior occasions testified to does not fall within *Drew.* The government cites *Jones v. United States,* 477 A.2d 231, 237–38 (D.C.1984) for the proposition that appellant's gun possession prior to the crime is admissible without regard to *Drew.* The gun in *Jones,* however, was a pistol, not a sawed-off shotgun like the gun at issue in the instant case. In *Jones* we stated that "[p]ossession of a gun, without more, is not wrongful conduct." *Id.* at 237 (citing *Fornah v. United States,* 460 A.2d 556, 562 (D.C.1983)). The guns at issue in *Fornah,* however, were .38 and .45 caliber revolvers (pistols). The court in *Fornah* noted that properly registered pistols may be kept on the owner's premises. *Fornah, supra,* at 562 n. 6. A sawed-off shotgun, however, differs from such guns because it is illegal to possess such a weapon in the District of Columbia. D.C.Code § 22–3214(a) (1989).

Because possession of a sawed-off shotgun is different from possession of a pistol in that mere possession of a sawed-off shotgun constitutes a violation in the law, this court must reject the government's threshold argument and analyze the prosecutor's use of the evidence under *Drew v. United States, supra.*

> It is well-settled that evidence of prior bad acts which are criminal in nature, *and independent of the crime charged,* is inadmissible to prove that a criminal defendant is a person of bad character, and on the occasion charged acted in conformity with his criminal character. Evidence of other wrongful acts is admissible, however, if it is relevant to and probative of one or more of the following issues: (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity.

*Jones v. United States,* 477 A.2d at 237 (citations omitted) (emphasis added).

■ As we have seen, the evidence concerning a prior bad act of appellant of having such a weapon is inherently "criminal in nature." *See* D.C.Code § 22–3214(a) (1989). The question under *Drew* and its progeny then becomes whether the prior possession by appellant of the sawed-off shotgun is "independent of the crime charged." Tending to support appellant's

argument is the fact that unlike the situation in *Jones* where Jones' prior pistol possession was connected with his prior threats against the murder victim, Dickens' reported viewing of a sawed-off shotgun in appellant's possession occurred several weeks before appellant's use of the weapon against the victim. On that earlier occasion, Dickens asked appellant to remove the gun from the home because she feared for the safety of her child. Dickens testified that appellant put the gun in a duffel bag and then placed it in the trunk of his car in early January, 1985, approximately one month before the murder of Lovells on February 3, 1985. Thus, the circumstances under which Dickens saw appellant with the shotgun appear at first blush to be unconnected with the murder of Lovells.

On the other hand, there was other testimony which supports an inference that the murder weapon was the sawed-off shotgun Dickens saw in appellant's duffel bag.[13] Vanessa Conway testified that appellant told her on February 3, 1985, that he kept a sawed-off shotgun in his trunk. Conway further testified that appellant retrieved the duffel bag from the trunk of his car after his meeting with Manning in Manning's residence shortly before the shooting. He also told her on February 3, 1985, that he planned to shoot Lovells.

Manning testified that appellant brought the bag with him in the pick-up truck on February 3, 1985, and that it sat on the floor of the truck during the shooting. When appellant emerged from the pick-up truck near Vanessa Conway's apartment after the shooting, he had the bag with him.

Vanessa Conway testified that appellant then called Larry Cannon, told him he accomplished what he set out to do and asked Conway to take the bag over to Cannon but not to look inside or touch the bag.[14] Conway also testified that when appellant returned to her apartment he showed her a red shotgun shell. An expended red shotgun shell was found by police at the scene of the murder.

The testimony just summarized, together with eyewitness testimony that the murder was committed by appellant with a sawed-off shotgun and that he was in possession of a similar bag the night of the murder, sufficiently connect the sawed-off shotgun to appellant to make the prior sawed-off shotgun possession relevant to the Lovells murder and thus not an independent crime.[15] This evidence, consisting of Dick-

13. Vanessa Conway described the bag as a light tan tote bag, a rounded bag measuring 1 and ½ to 2 feet. She testified that appellant took this bag to Manning's truck, and returned with the same bag around 10:00 to 10:30 p.m. Marshall Manning described the bag appellant retrieved from appellant's trunk and brought along in Manning's truck on the night of the murder as a grey bag. Manning testified that he did not see appellant do anything with the bag while it was in his truck, but appellant took the grey bag with him when he left his truck near Vanessa Conway's apartment. Manning testified that appellant returned his jumper cables and tools in a brown paper bag but did not remember when appellant returned them; these cables were not in the grey bag. Willie Mae Smith testified that the bag appellant brought to Vanessa Conway's apartment that evening was blue. After seeing a sawed-off shotgun and shotgun cartridges in appellant's possession in the home they shared in January, 1985, Mary Dickens saw the shotgun a few days later in the "tanish" brown bag she had just given him for Christmas. Mary Dickens described the bag as big, measuring 2 and ½ to 3 feet. Mary Dickens testified that appellant placed the bag into his car trunk in mid-January, 1985. Larry Cannon testified that

Conway brought him a brown duffel bag containing some of his personal effects from Vanessa's apartment on the evening of February 3, 1985. Appellant testified that he gave Marshall Manning a brown, leather tool bag of a lighter shade of brown than the brown bag he received from Dickens for Christmas) containing tools and jumper cables on February 3, 1985 around 8:30 p.m. Appellant also testified that he brought a bag to Vanessa's that he wanted Vanessa to take to Larry Cannon's, and that it contained Larry's things from appellant's house that had been in appellant's trunk for two weeks.

14. Larry Cannon testified that the bag did not contain a gun.

15. Marshall Manning was the only witness to identify appellant as Lovells' assassin at the time of the shooting. Eyewitnesses from across the street at the gas station testified about the circumstances of the shooting, noting the presence of two men in the blue pick-up truck. Government experts testified that these descriptions were consistent with the firing of a sawed-off shotgun at close range.

ens' testimony and the photographs of a sawed-off shotgun and shells, was not evidence of other crimes or bad acts and subject to *Drew.* Rather, these items constituted evidence of the crime charged.

## V.

■ Appellant's counsel informed this court at oral argument that in his view the trial court's failure to give an accomplice instruction *sua sponte* constituted plain error. As this ground was not addressed in his initial appellate brief, and he had not yet researched it, counsel requested and, without objection by the government, was granted leave to file a supplemental brief on this issue. He has done so, and the government has submitted a supplementary brief in response.

Appellant argues that the trial court committed plain error in failing to give an accomplice or other cautionary instruction [16] *sua sponte* to counteract the allegedly uncorroborated testimony of Vanessa Conway and Marshall Manning placing appellant at the scene of the murder.[17] The government contends that the trial court's failure to give the accomplice instruction *sua sponte* did not jeopardize the fairness and integrity of the trial because the testimony of witnesses Manning and Conway was corroborated in many important respects by the testimony of other witnesses, because the jury was given the court's instruction on general factors affecting credibility, and because of the strength of the government's evidence of appellant's guilt.

It has long been noted in our case law that "the better practice" is for the trial court to instruct the jury *sua sponte* concerning accomplice testimony when appropriate, and that failure to so instruct when requested may be reversible error. *Price v. United States,* 531 A.2d 984, 986 (D.C. 1987) ("usual practice"); *Fields v. United States,* 396 A.2d 522, 526 (D.C.1978) ("better practice"). *See Freed v. United States* 49 U.S.App.D.C. 392, 266 F. 1012 (1920). Failure to request such an instruction at trial, however, places a significant burden on appellant "of showing that the instructions as given 'were so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.'" *Fields, supra,* at 525 (quoting *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc)). It is our view that appellant has failed to meet that burden here.

Although the jury was not instructed in accordance with Instruction No. 2.22, it was nevertheless made aware through cross-examination and argument of the motives of the accomplice witnesses for testifying against appellant. (Conway's plea bargain agreement was an exhibit); (Manning gave testimony that he was afraid he would be charged as an accessory). *See Price v. United States, supra,* 531 A.2d at 987 (jury's full awareness of plea agreement significant to court's decision not to require jury instruction on immunized wit-

---

16. Appellant argues that Criminal Jury Instruction for the District of Columbia No. 2.22 would have been appropriate. Appellant notes, however, that the record is unclear as to whether Vanessa Conway was given immunity in exchange for her testimony against appellant at trial. If given immunity, appellant notes that Instruction No. 2.22 would have sufficed but that this instruction was neither requested nor given *sua sponte.* The government does not address this immunity instruction argument in its brief. Appellant fails to carry his burden of showing plain error on the failure of the court to *sua sponte* give an immunity jury instruction as he has not demonstrated that Conway was given immunity from prosecution in exchange for her testimony.

17. Criminal Jury Instruction of the District of Columbia No. 2.22 (3d ed. 1978) provides:

Accomplices in the commission of a crime are competent witnesses and the government has a right to use them as witnesses. An accomplice is anyone who knowingly and voluntarily cooperates with, aids, assists, advises, or encourages another person in the commission of a crime, regardless of his degree of participation.

The testimony of an alleged accomplice should be received with caution and scrutinized with care. You should give it such weight as in your judgment it is fairly entitled to receive. You may convict a defendant upon the uncorroborated testimony of an alleged accomplice only if you believe that the testimony of the accomplice proves the guilt of the defendant beyond a reasonable doubt.

ness testimony); *United States v. Herron*, 185 U.S.App.D.C. 403, 408, 567 F.2d 510, 515 (1977) (witness's "exact interest" before the jury through her testimony). In addition, the trial court provided the usual instruction to the jury concerning the evaluation of the credibility of witnesses.[18] A review of the trial transcript indicates that some of Conway's and Manning's testimony was corroborated by non-accomplice witnesses and some was not. As to the extent of corroboration necessary to bolster the inherently suspect testimony of accomplice witnesses, our cases have not required complete or interlocking corroboration. Instead, corroboration of significant portions of the testimony of accomplices has been deemed sufficient to avoid a determination of plain error in failing to give an accomplice instruction *sua sponte*. *Price, supra*, 531 A.2d at 986 ("testimony was not uncorroborated and, in fact, it was buttressed at various points by the testimony of the other witnesses."). *See also United States v. Herron, supra*, 185 U.S.App.D.C. at 408, 567 F.2d at 515 ("principal features" of accomplice testimony were corroborated); *United States v. Leonard*, 161 U.S.App. D.C. 36, 41, 494 F.2d 955, 960 (1974) ("nonaccomplice testimony corroborated the accomplice testimony to a significant extent against Leonard, and to a lesser extent against Sarvis"; no "exceptional circumstances" warranted finding of plain error

in trial court's failure to give accomplice instruction *sua sponte* given the circumstances). Many details of the events on the evening of February 3, 1985 were corroborated by witnesses other than Conway and Manning, including appellant.[19] It must be acknowledged that the testimony of Conway and Manning helped to solidify and tie together the various pieces of circumstantial evidence against appellant; but, this is not a bar to a determination that there was no plain error. *See Price, supra*, 531 A.2d at 986.

In sum, because much of the testimony of Vanessa Conway and Marshall Manning was corroborated by other witnesses, including the testimony of appellant himself, because the motives of Conway and Marshall in testifying were made clear to the jury, and because the jury was correctly instructed on the general considerations that apply to credibility determinations, we hold that appellant has failed to demonstrate plain error in the trial court's failure to give the accomplice jury instruction *sua sponte*.

## VI.

■ Appellant argues that he should have been granted a hearing to present his ineffective assistance of counsel claim under D.C.Code § 23–110 (1989).[20] This court

---

18. The jurors were instructed that they should evaluate, among other things, "whether the witness had any motive for not telling the truth" and "whether the witness has any interest in the outcome of this case or friendship or animosity towards other persons concerned in the case."

19. Appellant's testimony provided a significant amount of corroboration of the testimony of the government's witnesses. Appellant testified that he met Lovells in December, 1984 and that he lent Lovells money. Appellant needed money to open his own store. Appellant also testified that he was at Conway's apartment on the evening of February 3, 1985. While at Conway's, he helped place a call to Lovells. Appellant and Conway then went to Manning's residence where appellant admits having a brown bag, although he contends it contained tools and jumper cables. Appellant also testified that he gave Manning a brown leather-type tool bag. Appellant stated that he and Manning left Manning's and went to a gas station.

Appellant's testimony diverges only with respect to the short period of time during the

evening when the murder actually took place. Appellant testified that Manning left him at the gas station where appellant was waiting for Conway and that when she did not arrive, he took a cab back to her apartment where Conway and Smith were waiting. With respect to succeeding events, appellant's testimony again parallels that of some of the government witnesses. Appellant stated that he and Smith took a cab over to the home of appellant's family while Conway took appellant's car. Appellant also testified that he gave Vanessa a bag to deliver to Larry Cannon. There is no dispute that Conway picked up appellant and Smith from his family's house around midnight and they all proceeded over to Conway's where they spent the night until 5 a.m. on February 4, 1985.

20. Appellant also sought a new trial in the "interest of justice," Super.Ct.Crim.R. 33, and on the basis of newly discovered evidence. As to the former, it was concededly filed late, and we are unpersuaded that appellant has put forward any basis for relieving him of that default.

has held that a hearing need not be granted if "the motion, files, or other records contain data which belie a prisoner's claim, and such contradiction is not susceptible of reasonable explanation." *Pettaway v. United States*, 390 A.2d 981, 983 (D.C.1978). *Accord, McClurkin v. United States*, 472 A.2d 1348, 1352–53 (D.C.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984).

In determining whether the trial court correctly decided whether it was required to grant a hearing, we must as a preliminary matter consider whether an appellant who has knowingly and intelligently waived his right to counsel may present a claim for ineffective assistance of counsel. The Supreme Court, in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), established that a defendant has the constitutional right to self-representation when he has made a knowing and intelligent waiver of his right to counsel. *Id.* at 819, 95 S.Ct. at 2533. Were this a case where the appellant had been solely responsible for his own defense, it is obvious that no claim of ineffective assistance of counsel could lie.[21] A defendant who knowingly and intelligently waives his right to assistance of counsel and therefore serves as his own counsel, can have no basis for such a claim. *Id.* at 834 n. 46, 95 S.Ct. at 2541 n. 46; *Hsu, supra*, 392 A.2d at 980 n. 7, *appeal after remand*, 439 A.2d 469 (D.C.1981). Frequently, however, as happened in this case, a defendant receives the assistance of attorneys whom courts have called "standby" counsel, "co-counsel," "back-up counsel," or "advisory" counsel. The Supreme Court has held that while a defendant does not have a constitutional right to such "hybrid" representation, the trial court may permit this arrangement in its own discretion. *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 953–54, 79 L.Ed.2d 122 (1984). *See also Griffin v. United States, supra*, 447 A.2d at 778–79, *cert. denied*, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). If counsel participates, in a secondary position, his or her potential for ineffectiveness, though diminished by the defendant's primary role, is not completely eliminated.[22]

With respect to the assertedly newly discovered evidence, we perceive no abuse of discretion in the trial court's determination that appellant failed to show that Freddy Jackson's testimony was not available during trial. *See Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985); *(Joel) Smith v. United States*, 466 A.2d 429, 432–33 (D.C.1983).

21. Other jurisdictions have held that no ineffectiveness claim is possible where a defendant was entirely in charge of his own defense or refused to utilize the standby counsel that was available. *See, e.g., United States v. Johnson*, 585 F.2d 374, 376 (8th Cir.1978) (where standby counsel was kept from assisting defendant because the defendant chose to ignore him, ineffectiveness claim fails), *cert. denied* 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979); *United States v. Johnson*, 434 F.2d 827, 830 (9th Cir.1970) (where defendant "deliberately rejected services of an attorney" and assumed responsibility of counsel, defendant cannot contend that advisory services rendered were inadequate); *Carter v. State*, 512 N.E.2d 158, 163–64 (Ind.1987) (where defendant had the assistance of co-counsel, and co-counsel performed tasks only at the behest of the defendant and the defendant remained "the captain of the defense team," the defendant could not make a claim for ineffective assistance); *Moore v. State*, 142 Ga.App. 145, 146–47, 235 S.E.2d 577, 578 (1977)

(where public defender was placed with the defendant for the sole purpose of supplying procedural information, defendant who refused counsel is precluded from claiming ineffective assistance of counsel); *State v. Randall*, 530 S.W.2d 407, 410 (Mo.App.1975) ("[t]he discretionary action of the trial court in appointing such 'standby counsel' in the interest of the administration of justice cannot be converted to a claim of error on the basis of inadequate representation," where trial judge declines to allow advisory counsel to make closing argument in addition to that made by defendant).

22. Other courts have recognized a claim for ineffectiveness of counsel where both defendant and counsel have played a role, but we have not found a case where the court has held that the defendant asserting ineffectiveness has satisfied the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., McQueen v. Blackburn*, 755 F.2d 1174, 1178 (5th Cir.1985) (where counsel had handled case for three days prior to defendant taking complete responsibility for case, defendant could bring an ineffectiveness claim; *Strickland* test, however, was not satisfied), *cert. denied, McQueen v. Maggio*, 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985); *United States v. Causey*, 835 F.2d 1289, 1293 (9th Cir.1987) (where defendant waived counsel after full explanation of rights, alleged fact that

Therefore, we hold that where the trial has been conducted with a hybrid arrangement for representation, the defendant may assert an ineffectiveness claim that challenges counsel's competency "within the limited scope of the duties assigned to or assumed by counsel," *People v. Bloom*, 48 Cal.3d 1194, 1226, 774 P.2d 698, 718, 259 Cal.Rptr. 669, 689 (1989), *cert. denied, Bloom v. California*, — U.S. —, 110 S.Ct. 1503, 108 L.Ed.2d 638 (1990).

▪ A reviewing court must apply the two-part test of *Strickland v. United States*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), to any claim of ineffectiveness of counsel in such limited representation. *Strickland* requires a convicted defendant to demonstrate that the counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and that but for this ineffective representation, there is a reasonable probability that the outcome of the trial would have been more favorable to defendant.

We proceed next to apply the *Strickland* test to the limited representation accepted by appellant. In light of the colloquy between appellant and Judge Nunzio discussed above, we consider that appellant waived his Sixth Amendment right to counsel only to the extent that he took over his own defense. Thus, appellant entered into only a limited waiver of his Sixth Amendment right to counsel. From the beginning, appellant sought to take over only a portion of the role of defense counsel, principally the questioning of witnesses he considered "coerced." He so indicated in his written motion seeking "standby counsel" as well as in the discussion at the time the trial court examined appellant in open court concerning his decision to represent himself. Appellant's Sixth Amendment right to the effective assistance of counsel attached before trial and was in full effect until the first day of trial when the trial court examined him concerning his waiver of his rights to counsel and to represent himself. Thereafter, the Sixth Amendment right to counsel still applied to the extent of standby counsel's substantial role at trial. To the extent that he participated, standby counsel's performance as counsel is to be measured under the standards enunciated in *Strickland*. To hold otherwise would deprive appellant of a Sixth Amendment right when it is evident from the trial transcript that he intended to rely substantially on standby counsel's participation in the trial.[23] We will bear in mind,

appointed counsel advised him to represent himself did "not remotely approach satisfaction of the two-part test for ineffective assistance of counsel"); *Estelle v. State*, 558 So.2d 843, 847 (Miss.1990) (where standby counsel had no authority or discretion in conduct of defense, ineffectiveness claim, was without merit); *People v. Bloom*, 48 Cal.3d 1194, 1226, 774 P.2d 698, 718, 259 Cal.Rptr. 669, 689 (1989) (where counsel acted in an advisory or other limited capacity, "defendant must show that counsel failed to perform competently *within the limited scope of the duties assigned to or assumed by counsel* ... and that a more favorable verdict was reasonably probable in the absence of counsel's failings") *cert. denied, Bloom v. California*, — U.S. —, 110 S.Ct. 1503, 108 L.Ed.2d 638 (1990); *Rodriguez v. State*, 763 S.W.2d 893, 896 (Tex.Ct. App.1988) (where defendant was represented during a portion of his trial, claim for ineffectiveness can lie, but fails where defendant was completely uncooperative towards his counsel); *People v. Doane*, 200 Cal.App.3d 852, 864–65, 246 Cal.Rptr. 366, 373 (1988) (where defendant had use of advisory counsel, ineffectiveness claim may relate only to the narrow role played by that advisory counsel); *Hance v. Kemp*, 258 Ga.

649, 649–51, 373 S.E.2d 184, 186 (1988) (where portion of the defense was conducted by an attorney before defendant asserted his right to defend himself, court may consider ineffectiveness claim for that portion of the trial); *State v. Bettney*, 529 A.2d 1356, 1356–57 (Me.1987) (where defendant asserted right to represent herself, and acquiesced in all that her advisory counsel did for her, defendant could claim ineffectiveness, but record reveals nothing to support that claim).

23. Appellant cross-examined six of the 20 witnesses called by the government (Abersynia Lovells, the victim's wife whom he did not know; Vanessa Conway, appellant's cousin; Marshall "Butch" Manning, a long-time friend of appellant; Willie Mae Smith, a former girlfriend of appellant; Mary Eunice Dickens, a former girlfriend of appellant; and Henry A. Berberich, a park police officer who participated in the arrest of appellant's friend Larry Cannon). Appellant's co-counsel, Mr. Hillegas, cross-examined ten government witnesses (four were not cross-examined by the defense), examined all 14 of the defense witnesses and gave the defense's opening and closing arguments.

however, in our examination of the record that Judge Nunzio and appellant reached a clear and express understanding that appellant would be "lead counsel," and that if there should arise any disagreement between appellant and appointed counsel, the judge would look to appellant.

Appellant's primary claim of ineffectiveness is that Mr. Hillegas told appellant that the court would not permit certain alibi and impeachment witnesses to be called. Appellant specifically asserts that his standby trial counsel told him that the court would not permit him to call Faye Cannon, "Unice" Cannon, and Ms. Collens regarding a letter from the appellant to Conway which the prosecutor contended was an effort by appellant to tell Conway what to say at trial. If, as he now indicates, appellant wished to call those witnesses at trial, this is precisely the sort of thing he should have undertaken to do as "lead counsel," at least to the extent of making his wishes known to the trial judge. Moreover, it is doubtful that this testimony about the letter would have had an appreciable impact on the trial. Appellant's further allegation that Faye Cannon would also have testified that Larry Cannon was never seen with a shotgun does not raise a serious issue, for such testimony would have added no exculpatory information to the record. The claim that Unice Cannon would have supported appellant's alibi because appellant called her from a gas station on the night of February 3, 1985 contradicts other testimony given by the defense at trial,[24] and would not have aided the defense case measurably. Appellant also averred that trial counsel told him that the trial court would not permit him to call "two landlords" and

Ms. Teresa Conway (Vanessa Conway's daughter) whose testimony would have shown that Mary Dickens fabricated her testimony at trial. Again, appellant, as lead counsel, was in a position to raise this matter with the judge. Moreover, appellant supplied no affidavits or other materials to give content to the vague assertion that these witnesses would testify to fabrication.[25]

Appellant also claimed that Freddy Jackson should have been called as he would have testified that Manning had a motive to kill Lovells. As appellant concedes in his *pro se* filing, attempts to secure Jackson as a witness during trial were unsuccessful as the defense was unable to locate him. Appellant has not indicated how his counsel was ineffective in his efforts to locate this witness during trial. Finally, appellant argues that his standby counsel refused to question Larry Cannon on the government's efforts to get Cannon to affirm Vanessa Conway's testimony that she gave Cannon a shotgun from appellant, stating that the court would not permit it. Again, we see this decision as tactical in nature and not violative of *Strickland*. See *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985). We have examined appellant's remaining assertions of ineffective representation by counsel, and find them equally unpersuasive.

In sum, we conclude that although appellant may assert a claim for ineffective assistance of counsel rendered in the context of the hybrid co-counsel arrangement permitted by the trial court, appellant's ineffectiveness claim fails because the allegations pertaining to the conduct of appel-

---

**24.** The proposed alibi testimony of Unice Cannon that she spoke with appellant conflicts with appellant's alibi testimony at trial that he was at his mother's house around 9:00 p.m. (Lovells was shot at approximately 9:24 p.m.) and was talking with Ms. Sheila Lewis from his mother's house at the time of the murder.

**25.** In addition, the appellant has not shown that these witnesses were unknown to him during the trial. It is unclear from the record whether two of these three are the "two landlords" referenced in appellant's *pro se* motion. It is also

unclear from appellant's appellate brief whether appellant still asserts he wished to call Ms. Teresa Conway to impeach Mary Dickens as he had stated in his *pro se* motion. In any event, the transcript makes it clear that appellant was told the names of the "two landlords" during the trial. Mary Dickens testified that her two landlords were "Browning Sandage" and "Lucille Fisher." These names were elicited by appellant during his cross-examination of Ms. Dickens.

lant's standby counsel are vague and conclusory,[26] involve matters in the nature of tactical decisions,[27] and, in any event, were not so crucial as to have affected the outcome of the case.[28]  Accordingly, we hold that the trial court correctly denied appellant's motion for a hearing.[29]

For the above-stated reasons, appellant's conviction is

*Affirmed.*

26.  Appellant does not claim on appeal or in the record that appellant provided sufficient information to standby counsel of the need for the testimony of Faye Cannon, Unice Cannon, Ms. Collens, Teresa Conway or the "two landlords." *See Strickland, supra,* 466 U.S. at 691, 104 S.Ct. at 2066-67 (trial counsel properly relies on information provided by defendant).  *Accord, White v. United States,* 484 A.2d 553, 559 (D.C. 1984).

27.  Appellant's *Ex Parte* Memorandum in Support [of] Motion for Investigator stated: "Counsel advised the defendant not to ask the witness Larry Cannon about any promises made by the government with respect to his testimony."  Our review of the trial transcript shows that Mr. Hillegas, not appellant, questioned defense witness Larry Cannon.  Even if appellant is claiming ineffective assistance of counsel concerning questions posed to Larry Cannon by Mr. Hillegas, this claim fails.  Hillegas' decision concerning the questions he asked of Larry Cannon were of a tactical nature.  *See Curry v. United States, supra,* 498 A.2d at 540.

28.  Appellant claims that Mr. Hillegas prevented appellant from pursuing certain avenues of cross-examination.  This allegation is so vague that it is unclear to what appellant's claim on appeal refers.  In appellant's *Ex Parte* memorandum, appellant complains: "Counsel also advised the defendant not to inquire in [*sic*] any motives Manning had for committing the killing himself."  We reject appellant's argument that appellant's failure to follow certain avenues of inquiry on cross "must be considered as though the omissions were of the defense counsel himself."  Accordingly, as to questions appellant asked of Marshall Manning during cross-examination, appellant may not bring an ineffective assistance of counsel claim based on his own actions in representing himself.  *See Faretta, supra,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46.

29.  The remaining points appellant raises on appeal do not require extended discussion.  We are unpersuaded by appellant's argument that the government injected plain error into the trial by opening its cross-examination of appellant with a question about his prior murder conviction after appellant's last answer on direct examination was that he had not seen decedent on the day the latter was murdered.  *See Dorman v. United States,* 491 A.2d 455 (D.C. 1984) (en banc).  Appellant's counsel had already questioned appellant on direct examination about the previous murder conviction, and so it was already known to the jury before the challenged questioning occurred.  Although the question immediately preceding the impeachment implied that appellant could not have committed the crime, this is not an instance where an outright general denial was followed by the prosecution with a question about a conviction for a similar offense, a practice proscribed by *Dorman.*  Further lessening the possibility of prejudice, there was a break between the previous answer and the question.  Under all the circumstances, we perceive no error.

We likewise find that no prejudice to defendant resulted from the government's recross-examination of appellant's character witness, Walter B. Cox, Jr., with inquiries that related to the witness' knowledge of facts, rather than community opinion, surrounding appellant's previous murder conviction.  Appellant had already inquired into such factual matters on redirect examination.  Although the government's questioning was improper before our subsequent ruling in *Rogers v. United States,* 566 A.2d 69 (D.C.1989) (en banc), there was no prejudice under the circumstances, and any error under then-controlling law was harmless.

We have examined appellant's claims of prosecutorial misconduct, and are satisfied that although some of the prosecutor's remarks would have better been left unsaid, any resulting error did not rise to the level of substantial prejudice, and thus was harmless.  *See (Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980).

Similarly, we have examined appellant's arguments concerning an isolated passage of the court's introductory jury instructions to the effect that the jury need not "worry about each little word" of the jury instructions and find no plain error.  *See Watts v. United States,* 362 A.2d 706, 708-09 (D.C.1976) (en banc).  Nor did the court err in denying appellant a manslaughter instruction.  *See West v. United States,* 499 A.2d 860, 864-65 (D.C.1985).